## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

EDMUND ALVES, derivatively on behalf of
MARRIOTT INTERNATIONAL, INC.,
c/o Timothy Brown, Esq.
The Brown Law Firm, P.C.
240 Townsend Square
Oyster Bay, NY 11771

      Plaintiff,

      vs.

ARNE M. SORENSON,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

KATHLEEN KELLY OBERG,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

BAO GIANG VAL BAUDUIN,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

BRUCE HOFFMEISTER,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

J.W. MARRIOTT, JR.,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

BRUCE W. DUNCAN,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

**C.A. No. _____**

**DEMAND FOR JURY TRIAL**

DEBORAH MARRIOTT HARRISON,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

FREDERICK A. HENDERSON,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

ERIC HIPPEAU,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

LAWRENCE W. KELLNER,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

DEBRA L. LEE,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

AYLWIN B. LEWIS,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

GEORGE MUÑOZ,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

STEVEN S REINEMUND,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

and

SUSAN C. SCHWAB,
c/o Marriott International, Inc.
10400 Fernwood Road,
Bethesda, MD 20817,

Defendants,

and

MARRIOTT INTERNATIONAL, INC.,
10400 Fernwood Road,
Bethesda, MD 20817,

Nominal Defendant.

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Edmund Alves ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Marriott International, Inc. ("Marriott" or the "Company") Arne M. Sorenson, Kathleen Kelly Oberg, Bao Giang Val Bauduin, Bruce Hoffmeister, J.W. Marriott, Jr., Bruce W. Duncan, Deborah Marriott Harrison, Frederick A. Henderson, Eric Hippeau, Lawrence W. Kellner, Debra L. Lee, Aylwin B. Lewis, George Muñoz, Steven S Reinemund, and Susan C. Schwab (collectively, the "Individual Defendants," and together with Marriott, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Marriott, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants,

United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Marriott, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Marriott's directors and officers from November 9, 2016 through the present (the "Relevant Period").

2.      Formed in 1992 following a corporate split of previously combined concessions and lodging businesses, Marriott is global operator, franchisor, and licensor of hotel, residential and timeshare properties.

3.      Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") was, prior to September 23, 2016, a public Company that owned, operated, franchised, and managed hotels, resorts, spas, residences, and vacation ownership properties. Starwood owned eleven separate brands, including W Hotels, St. Regis, Sheraton Hotels & Resorts, Westin Hotels & Resorts, Element Hotels, Aloft Hotels, The Luxury Collection, Tribute Portfolio, Le Méridien Hotels & Resorts, Four Points by Sheraton and Design Hotels.

4.      On November 16, 2015, Marriott and Starwood announced the approval of a definitive merger agreement between the two companies.

5.      On September 23, 2016, Starwood was acquired by Marriott (the "Starwood Acquisition").

6.     Prior to and throughout the Starwood Acquisition, an unresolved security vulnerability existed in Starwood's guest reservation database in the United States. The security vulnerability was not revealed until September 2018.

7.     On November 30, 2018, before markets opened, the Company issued a press release revealing that there had been a data security incident involving the Starwood guest reservation database, which had been discovered upon investigating a September 8, 2018 internal security alert. As a result of said vulnerability, certain actors had gained unauthorized access to Starwood's network since 2014, exposing data for up to 500 million users (the "Data Breach").

8.     Marriott's due diligence during the acquisition process failed to reveal that Starwood's reservation system had been accessed by hackers sometime in 2014.

9.     As revealed by the November 30, 2018 press release, data compromised by the Data Breach "include[d] some combination of name, mailing address, phone number, email address, passport number, Starwood Preferred Guest ("SPG") account information, date of birth, gender, arrival and departure information, reservation date, and communication preferences" in addition to "payment card numbers and payment card expiration dates" for approximately 327 million guests. The press release additionally revealed that information as to "name and sometimes other data such as mailing address, email address, or other information" was compromised for the remaining guests.

10.     On this news, the Company's share price dropped approximately 5.6%, or $6.81, from a closing price of $121.84 per share on November 29, 2018 to close at $115.03 per share on November 30, 2018.

11.     The Individual Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to permit and/or fail to prevent the Data Breach.

12.     Also during the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and/or misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact to the investing public that failed to disclose that: (1) the Company did not maintain customer's personal data on a secure system; (2) unknown actors had gained unauthorized access to Starwood's network since 2014; (3) Marriott's due diligence in the Starwood Acquisition failed to discover the Data Breach; (4) the Data Breach caused personal information of up to 500 million guests to be exposed; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and/or misleading statements and/or omissions of material fact to the investing public.

14.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

15.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while seven of them engaged in insider sales, netting proceeds of approximately $45.7 million. Approximately 26 million shares of the Company's common stock were repurchased between October 1, 2017 and September 30, 2018 for over $3.39 billion. As the Company's stock was actually only worth $113.50 per share, the

price at which it was trading when markets closed on December 4, 2018, the Company overpaid over $451.4 million in total.

16.     In light of the Individual Defendants' misconduct, which has subjected Marriott, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its Chief Accounting Officer ("CAO") and Controller to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of New York (the "Securities Class Action"), numerous purported consumer class actions filed in this Court and other Federal District courts (the "Consumer Class Actions"), investigations by Attorneys General of Maryland, New York and Georgia, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's, CFO's and CAO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Marriott Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because the Company is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Marriott common stock. Plaintiff purchased Marriott common stock before the Relevant Period began and has continuously held Marriott common stock since then.

### Nominal Defendant Marriott

23.     Marriott is a Delaware corporation with its principal executive offices at 10400 Fernwood Road, Bethesda, MD 20817. Marriott's shares trade on the NASDAQ under the ticker symbol "MAR."

### Defendant Sorenson

24.     Defendant Arne M. Sorenson ("Sorenson") has served as the Company's President and CEO since 2012 and a member of the Board since 2011. He has also served as the Company's President since May 25, 2018. Prior to becoming CEO, Defendant Sorenson served as the Company's Chief Operating Officer. According to the Company's Schedule 14A filed with the SEC on April 4, 2018 (the "2018 Proxy Statement"), as of January 31, 2018, Defendant Sorenson beneficially owned 1,628,654 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $147.34, Sorenson owned approximately $240 million worth of Marriott stock.

25.     For the fiscal year ended December 31, 2017, Defendant Sorenson received $13,311,617 in compensation from the Company. This included $1.3 million in salary, $5,310,583 in stock awards, $1,838,969 in stock appreciation rights ("SAR") awards, $3,628,950 in non-equity incentive plan compensation, $45,635 in change in pension value and nonqualified deferred compensation earnings, and $187,490 in all other compensation.

26.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Sorenson made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Average Price | Proceeds |
|---|---|---|---|
| December 7, 2016 | 19,235 | $   82.88 | $   1,594,197 |

Thus, in total, before the fraud was exposed, he sold 19,235 Company shares on inside information, for which he received approximately $1.6 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

27.     The Company's 2018 Proxy Statement stated the following about Defendant Sorenson:

Mr. Sorenson became President and Chief Executive Officer of the Company on March 31, 2012. Prior to that, he was President and Chief Operating Officer of the Company since May 2009. Mr. Sorenson joined Marriott in 1996 as Senior Vice President of Business Development and was appointed Executive Vice President and Chief Financial Officer in 1998, and assumed the additional title of President, Continental European Lodging, in January 2003. Prior to joining Marriott, he was a Partner in the law firm of Latham & Watkins in Washington, D.C. He served on the board of directors of Walmart, Inc. from 2008 to 2013. In addition, Mr. Sorenson served as Vice Chair of the President's Export Council. He is the immediate past Board Chair for Brand USA and continues as a member of the board. Other affiliations include: Chair, U.S. Travel Association CEO Roundtable; member of the Business Roundtable; member of the Luther College Board of Regents; member of the Stewardship Board of the World Economic Forum System Initiative on Shaping the Future of Mobility; and member of the Board of Trustees for The Brookings Institution. Mr. Sorenson was elected to the board of directors of Microsoft Corporation in November 2017. He was appointed to the Board of Directors in February 2011.

**Defendant Oberg**

28.     Defendant Kathleen Kelly "Leeny" Oberg ("Oberg") has served as the Company's Executive Vice President and CFO since 2016. According to the 2018 Proxy Statement, as of January 31, 2018, Defendant Oberg beneficially owned 36,560 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $147.34, Oberg owned approximately $5.4 million worth of Marriott stock.

29.     For the fiscal year ended December 31, 2017, Defendant Oberg received $4,859,970 in compensation from the Company. This included $750,000 in salary, $1,713,792 in stock awards, $765,020 in SAR awards, $1,046,850 in non-equity incentive plan compensation, $7,141 in change in pension value and nonqualified deferred compensation earnings, and $77,167 in all other compensation.

30.     The Company's website states the following about Defendant Oberg:[1]

Leeny Oberg was recently appointed as Marriott's Chief Financial Officer effective January 1, 2016.  Most recently, Ms. Oberg was the Chief Financial Officer for Ritz-Carlton since 2013, where she contributed significantly to the brand's

---

[1] http://news.marriott.com/p/leeny-oberg/. Last visited December 4, 2018.

performance, growth and organizational effectiveness. Previously, Ms. Oberg served in a range of financial leadership positions with Marriott. From 2008 to 2013, she was the company's Senior Vice President, Corporate and Development Finance, where she led a team which valued new hotel development projects and merger and acquisition opportunities, prepared the company's long range plans and annual budgets, and made recommendations for the company's financial and capital allocation strategy.

From 2006 to 2008, Ms. Oberg served in London as Senior Vice President, International Project Finance and Asset Management for Europe, the Middle East and Africa, and also as the region's senior finance executive.  Ms. Oberg first joined Marriott as part of its Investor Relations group in 1999.  Prior to joining Marriott, Ms. Oberg held a variety of financial leadership positions with such organizations as Sodexo (previously Sodexo Marriott Services), Sallie Mae, Goldman Sachs and Chase Manhattan Bank. She earned her Bachelor of Science in Finance/Management Information Systems from the University of Virginia, McIntyre School of Business and received her MBA from Stanford University Graduate School of Business.

**Defendant Bauduin**

31.     Defendant Bao Giang Val Bauduin ("Bauduin") has served as the Company's

Controller and CAO since 2014.

32.     The Company's website states the following about Defendant Bauduin:[2]

Val Bauduin is the Controller and Chief Accounting Officer for Marriott International. In this role, Mr. Bauduin is responsible for the accounting operations of the company, oversight of Financial Reporting & Analysis, Accounting Policy, Governance, Risk Management, Accenture Hospitality Services, and the Corporate Finance Business Partners.

Prior to joining Marriott, Mr. Bauduin was a partner and the U.S. Hospitality practice leader for Deloitte & Touche LLP. He also served as a Travel, Hospitality & Leisure industry expert for Deloitte teams globally. In that role, he supported audit, tax, consulting and advisory teams in delivering client services to major hospitality companies. While at Deloitte, Mr. Bauduin led the audit of a large gaming company and supported capital market transactions (including initial public offerings, debt, issuances, repurchases, debt-for-equity swaps and related derivative instruments), spinoffs and real estate development projects related to gaming and hospitality.

Mr. Bauduin earned a bachelor's degree from the University of Notre Dame in economics and accounting. He also holds an MBA in finance from The Wharton

---

[2] http://news.marriott.com/p/bao-giang-val-bauduin/. Last visited December 4, 2018.

School at the University of Pennsylvania. He is a Certified Public Accountant and a member of the American Institute of CPAs (AICPA). Additionally, Mr. Bauduin is a member of the America's Lodging Investment Summit and is a regular speaker at various hospitality conferences, including the Travel Distribution Summit of North America and the STR Hotel Data Conference.

**Defendant Hoffmeister**

33.    Defendant Bruce Hoffmeister ("Hoffmeister") has served as the Company's Global

Chief Information Officer ("CIO") since 2011.

34.    The Company's website states the following about Defendant Hoffmeister:[3]

Bruce Hoffmeister is Marriott International's Global Chief Information Officer, with global accountability for all business information technology resources.

Prior to that role, Mr. Hoffmeister served as Senior Vice President, IR Shared and Application Services, where he lead [sic] the effort to drive sustainable efficiencies within the technical infrastructure that supports the computing resources for Marriott's worldwide operations. In addition, he directed the development efforts to replace and update the Sales and Marketing, Event Management and Revenue Management systems in order to optimize profits across the total hotel, increase the efficiency of the selling process and enable the delivery of superior events.

He joined Marriott in 1989 as a Senior Financial Analyst for Development Finance. Since then, Mr. Hoffmeister has held various finance and accounting roles within the Development, Information Resources, and Lodging functions. He also has held the position of Senior Vice President, Global Revenue Management where he was responsible for developing and leading the company's worldwide pricing, inventory management and selling strategies.

Mr. Hoffmeister holds bachelor degrees in mathematics and biology, with a minor in computer science, from Thomas More College. He also earned an MBA from Vanderbilt University's Owen Graduate School of Management, with concentrations in finance and accounting.

**Defendant J.W. Marriott**

35.    Defendant J.W. Marriott ("J.W. Marriott") has served on the Board of the Company

and its predecessors since 1964. He has served as the Company's Executive Chairman and

Chairman since 2012, and prior to that, served as the Company's Chairman and CEO from 1985-

---

[3] http://news.marriott.com/p/bruce-hoffmeister/. Last visited December 4, 2018

2012. According to the 2018 Proxy Statement, as of January 31, 2018, Defendant J.W. Marriott beneficially owned 39,477,386 shares of the Company's common stock, representing 11% of all outstanding shares. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $147.34, J.W. Marriott owned over $5.8 billion worth of Marriott stock.

36.     For the fiscal year ended December 31, 2017, Defendant J.W. Marriott received $3,385,415 in compensation from the Company. This included $3 million in salary, $214,007 in change in pension value and nonqualified deferred compensation earnings, and $171,408 in all other compensation.

37.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant J.W. Marriott made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Average Price | Proceeds |
|---|---|---|---|
| February 27, 2017 | 33,892 | $   84.70 | $   2,870,652 |
| March 23, 2017 | 35,059 | $   93.42 | $   3,275,212 |
| September 5, 2017 | 10,376 | $   102.01 | $   1,058,456 |
| September 6, 2017 | 26,362 | $   101.78 | $   2,683,124 |

Thus, in total, before the fraud was exposed, he sold 105,689 Company shares on inside information, for which he received approximately $9.9 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

38.     The Company's 2018 Proxy Statement stated the following about Defendant J.W. Marriott:

> Mr. Marriott was elected Executive Chairman effective March 31, 2012, having relinquished his position as Chief Executive Officer. He had served as Chief

Executive Officer of the Company and its predecessors since 1972. He continues to serve as Chairman of the Board, a position he has held since 1985. He joined Marriott Corporation (formerly Hot Shoppes, Inc.) in 1956, became President in 1964, Chief Executive Officer in 1972 and Chairman of the Board in 1985. He serves on the board of trustees of The J. Willard & Alice S. Marriott Foundation and is a member of the Executive Committee of the World Travel & Tourism Council. He is the father of Deborah M. Harrison, a member of the Company's Board of Directors. Mr. Marriott has been a director of the Company and its predecessors since 1964.

**Defendant Duncan**

39.     Defendant Bruce W. Duncan ("Duncan") has served as a Company director since 2016. Prior to the Starwood Acquisition, Defendant Duncan had served as a director of Starwood since 1999, and as that company's Chairman since 2005. According to the 2018 Proxy Statement, as of January 31, 2018, Defendant Duncan beneficially owned 103,659 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $147.34, Duncan owned approximately $15.3 million worth of Marriott stock.

40.     For the fiscal year ended December 31, 2017, Defendant Duncan received $225,010 in compensation from the Company, comprised of $85,000 in fees earned or paid in cash, and $140,010 in stock awards.

41.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Duncan made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Average Price | Proceeds |
|---|---|---|---|
| March 21, 2017 | 4,863 | $  90.00 | $  437,670 |
| November 21, 2017 | 3,034 | $  128.09 | $  388,625 |
| December 5, 2017 | 2,580 | $  129.03 | $  332,897 |
| December 8, 2017 | 1,808 | $  129.70 | $  234,497 |
| December 13, 2017 | 8,644 | $  129.34 | $  1,118,014 |

14

Thus, in total, before the fraud was exposed, he sold 20,929 Company shares on inside information, for which he received approximately $2.5 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

42.     The Company's 2018 Proxy Statement stated the following about Defendant Duncan:

> Mr. Duncan has been Chairman of the Board of First Industrial Realty Trust, Inc., a real estate investment trust that engages in the ownership, management, acquisition, sale, development and redevelopment of industrial real estate properties, since November 2016. Prior to that, he was President and Chief Executive Officer of that company from January 2009. From April to September 2007, Mr. Duncan served as Chief Executive Officer of Starwood on an interim basis. He also was a senior advisor to Kohlberg Kravis & Roberts & Co., a global investment firm, from July 2008 to January 2009. He was also a private investor from January 2006 to January 2009. From May 2005 to December 2005, Mr. Duncan was Chief Executive Officer and Trustee of Equity Residential ("EQR"), a publicly traded real estate investment trust, and held various positions at EQR from March 2002 to December 2005, including President, Chief Executive Officer and Trustee from January 2003 to May 2005, and President and Trustee from March 2002 to December 2002. Mr. Duncan also serves on the board of directors of Boston Properties, Inc. and T. Rowe Price Mutual Funds. Mr. Duncan has been a director of the Company since September 2016 and previously served on the Starwood board of directors from 1999 to September 2016.

**Defendant Harrison**

43.     Defendant Deborah Marriott Harrison ("Harrison") has served as a Company director since 2014. According to the 2018 Proxy Statement, as of January 31, 2018, Defendant Harrison beneficially owned 29,189,935 shares of the Company's common stock, representing 8.14% of all outstanding shares.[4] Given that the price per share of the Company's common stock

---

[4] As a result of double counting of beneficial ownership of shares held in trusts and other entities, Defendants J.W. Marriott and Harrison together owned 11.3% of outstanding shares as of January 31, 2018.

at the close of trading on January 31, 2018 was $147.34, Harrison owned approximately $4.3 billion worth of Marriott stock.

44.     For the fiscal year ended December 31, 2017, Defendant Harrison received $668,513 in compensation from the Company.

45.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Harrison made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Average Price | Proceeds |
|---|---|---|---|
| November 10, 2017 | 130,000 | $   119.17 | $   15,491,749 |
| December 8, 2017 | 35,401[5] | $   128.85 | $   4,561,419 |
| February 22, 2018 | 20,000 | $   140.73 | $   2,814,600 |
| February 22, 2018 | 20,000 | $    39.89 | $    797,800 |
| February 22, 2018 | 20,000 | $   141.20 | $   2,824,000 |
| February 22, 2018 | 20,000 | $   141.93 | $   2,838,600 |

Thus, in total, before the fraud was exposed, she sold 245,401 Company shares on inside information, for which she received approximately $29.3 million. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions

46.     The Company's 2018 Proxy Statement stated the following about Defendant Harrison:

> Mrs. Harrison has been the Company's Global Officer, Marriott Culture and Business Councils since October 2013. She formerly served as Senior Vice President of Government Affairs for the Company from June 2007 through October 2013 and as Vice President of Government Affairs from May 2006 to June 2007. Mrs. Harrison is an honors graduate of Brigham Young University and has held several positions within the Company since 1975, including accounting positions at Marriott Headquarters and operations positions at Key Bridge and Dallas Marriott hotels. She has been actively involved in serving the community through participation on various committees and boards including, but not limited to, the Mayo Clinic Leadership Council for the District of Columbia and the boards of the Bullis School, the D.C. College Access Program, and The J. Willard & Alice S. Marriott Foundation. She has also served on the boards of several mental health

---

[5] This sale was made by Defendant Harrison's spouse.

organizations, including The National Institute of Mental Health Advisory Board, Depression and Related Affective Disorders Association, and the Center for the Advancement of Children's Mental Health in association with Columbia University. Mrs. Harrison also served as a member of the board of directors of Marriott Vacations Worldwide Corporation from 2011 to 2013. Mrs. Harrison has been a director of the Company since 2014.

**Defendant Henderson**

47.     Defendant Frederick A. Henderson ("Henderson") has served as a Company director since 2013, as serves as the Chair of the Audit Committee. According to the 2018 Proxy Statement, as of January 31, 2018, Defendant Henderson beneficially owned 10,108 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $147.34, Henderson owned approximately $1.5 million worth of Marriott stock.

48.     For the fiscal year ended December 31, 2017, Defendant Henderson received $245,010 in compensation from the Company, comprised of $105,000 in fees earned or paid in cash and $140,010 in stock awards.

49.     The Company's 2018 Proxy Statement stated the following about Defendant Henderson:

> Mr. Henderson served as Chairman and CEO of SunCoke Energy, Inc., the largest U.S. independent producer of metallurgical coke for the steel industry, from December 2010 until his retirement in December 2017. From January 2013 through December 2017, he also was Chairman and CEO of SunCoke Energy Partners GP LLC, the general partner of SunCoke Energy Partners, L.P., a publicly traded master limited partnership. He previously served as a Senior Vice President of Sunoco, Inc., a petroleum refiner and chemicals manufacturer with interests in logistics, from September 2010 until the completion of SunCoke Energy, Inc.'s initial public offering and separation from Sunoco in July 2011. Prior to Sunoco/SunCoke, Mr. Henderson served as President and CEO of General Motors Corporation ("GM") from March 2009 until December 2009. He held a number of other senior management positions during his more than 25 years with GM, including President and Chief Operating Officer from March 2008 until March 2009, Vice Chairman and Chief Financial Officer, Chairman of GM Europe, President of GM Asia Pacific and President of GM Latin America, Africa and Middle East, and served as a consultant for GM from February 2010 to September

2010 before joining Sunoco. Mr. Henderson also served as a consultant for AlixPartners LLC, a business consulting firm, from March 2010 until August 2010. In October 2016, he joined the board of directors of Adient plc. He is a Trustee of the Alfred P. Sloan Foundation and previously served on the board of directors of Compuware Corporation from 2011 to 2014. He has been a director of the Company since 2013.

**Defendant Hippeau**

50.     Defendant Eric Hippeau ("Hippeau") has served as a Company director since 2016, and is a member of the Compensation Policy Committee. Prior to the Starwood Acquisition, Defendant Hippeau had served as a director of Starwood since 1999. According to the 2018 Proxy Statement, as of January 31, 2018, Defendant Hippeau beneficially owned 37,172 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $147.34, Hippeau owned approximately $5.5 million worth of Marriott stock.

51.     For the fiscal year ended December 31, 2017, Defendant Hippeau received $225,010 in compensation from the Company, comprised of $85,000 in fees earned or paid in cash and $140,010 in stock awards.

52.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hippeau made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Average Price | Proceeds |
|---|---|---|---|
| November 20, 2017 | 4,863 | $  125.98 | $      612,641 |
| November 13, 2018 | 9,000 | $  116.23 | $   1,046,070 |

Thus, in total, before the fraud was exposed, he sold 13,863 Company shares on inside information, for which he received approximately $1.7 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

18

53. The Company's 2018 Proxy Statement stated the following about Defendant Hippeau:

> Mr. Hippeau has been Managing Partner with Lerer Hippeau, a venture capital fund, since June 2011. From 2009 to 2011, he was the Chief Executive Officer of The Huffington Post, a news website. From 2000 to 2009, he was a Managing Partner of Softbank Capital, a technology venture capital firm. Mr. Hippeau served as Chairman and Chief Executive Officer of Ziff-Davis Inc., an integrated media and marketing company, from 1993 to March 2000 and held various other positions with Ziff-Davis from 1989 to 1993. Mr. Hippeau served on the board of directors of The Huffington Post from 2006 to 2011 and Yahoo! Inc. from 1996 to 2011. Mr. Hippeau has been a director of the Company since September 2016 and previously served on the Starwood board of directors from 1999 to September 2016.

**<u>Defendant Kellner</u>**

54. Defendant Larry Kellner ("Kellner") has served as a Company director since 2002. According to the 2018 Proxy Statement, as of January 31, 2018, Defendant Kellner beneficially owned 22,320 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $147.34, Kellner owned approximately $3.3 million worth of Marriott stock.

55. For the fiscal year ended December 31, 2017, Defendant Hippeau received $235,010 in compensation from the Company, comprised of $95,000 in fees earned or paid in cash and $140,010 in stock awards.

56. The Company's 2018 Proxy Statement stated the following about Defendant Kellner:

> Mr. Kellner has been President of Emerald Creek Group, LLC, a private equity firm, since January 2010. In December 2017, he also resumed his role as Non-Executive Chairman of the board of directors of the Sabre Corporation, a global technology company, which he formerly held since August 2013, before serving as Executive Chairman of the board from December 2016 through December 2017. Mr. Kellner previously served as Chairman and Chief Executive Officer of Continental Airlines, Inc., an international airline company, from December 2004 through December 2009. He served as President and Chief Operating Officer of Continental Airlines from March 2003 to December 2004, as President from May

2001 to March 2003 and was a member of Continental Airlines' board of directors from May 2001 to December 2009. Mr. Kellner serves on the board of directors for The Boeing Company. He also served on the board of directors of Chubb Limited from January 2016 through December 2016 and on the board of directors of its predecessor, the Chubb Corporation, from 2011 to January 2016. He is active in numerous community and civic organizations. Mr. Kellner has been a director of the Company since 2002

**Defendant Lee**

57.     Defendant Debra L. Lee ("Lee") has served as a Company director since 2004. According to the 2018 Proxy Statement, as of January 31, 2018, Defendant Lee beneficially owned 29,956 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $147.34, Lee owned approximately $4.4 million worth of Marriott stock.

58.     For the fiscal year ended December 31, 2017, Defendant Lee received $239,502 in compensation from the Company, comprised of $95,000 in fees earned or paid in cash, $140,010 in stock awards, $929 in change in pension value and nonqualified deferred compensation earnings, and $3,563 in all other compensation.

59.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Lee made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Average Price | Proceeds |
|---|---|---|---|
| February 28, 2017 | 2,020 | $    87.37 | $      176,487 |

Thus, in total, before the fraud was exposed, she sold 2,020 Company shares on inside information, for which she received approximately $176,487. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions

60.     The Company's 2018 Proxy Statement stated the following about Defendant Lee:

Ms. Lee is Chairman and Chief Executive Officer of BET Networks, a media and entertainment subsidiary of Viacom, Inc. that owns and operates BET Networks and several other ventures. She joined BET in 1986 and served in a number of executive posts before ascending to her present position in January 2006, including President and Chief Executive Officer from June 2005, President and Chief Operating Officer from 1995 to May 2005, Executive Vice President and General Counsel, and Vice President and General Counsel. Prior to joining BET, Ms. Lee was an attorney with the Washington, D.C.-based law firm Steptoe & Johnson. She also serves on the board of directors of WGL Holdings, Inc. and Twitter, Inc. Ms. Lee also was a director of Eastman Kodak Company from 1999 to 2011, and Revlon, Inc. from 2006 to 2015. In addition, she serves on the board of a number of professional and civic organizations including as Past Chair of the Advertising Council, as the President of the Alvin Ailey Dance Theater, and as a Trustee Emeritus at Brown University. Ms. Lee has been a director of the Company since 2004.

**Defendant Lewis**

61.     Defendant Aylwin B. Lewis ("Lewis") has served as a Company director since 2016, and is a member of the Audit Committee. Prior to the Starwood Acquisition, Defendant Lewis had served as a director of Starwood since 2013. According to the 2018 Proxy Statement, as of January 31, 2018, Defendant Lewis beneficially owned 10,608 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $147.34, Lewis owned approximately $1.6 million worth of Marriott stock.

62.     For the fiscal year ended December 31, 2017, Defendant Lewis received $248,963 in compensation from the Company, comprised of $95,000 in fees earned or paid in cash, $140,010 in stock awards, $82 in change in pension value and nonqualified deferred compensation earnings, and $13,831 in all other compensation..

were exposed demonstrates his motive in facilitating and participating in the scheme.

63.     The Company's 2018 Proxy Statement stated the following about Defendant Lewis:

Mr. Lewis served as Chairman, Chief Executive Officer and President of Potbelly Corporation, a franchisor of quick service restaurants, from June 2008 until his retirement in November 2017. From September 2005 to February 2008, Mr. Lewis

was President and Chief Executive Officer of Sears Holdings Corporation, a nationwide retailer. Prior to being named Chief Executive Officer of Sears, Mr. Lewis was President of Sears Holdings and Chief Executive Officer of KMart and Sears Retail following Sears' acquisition of Kmart Holding Corporation in March 2005. Prior to that, Mr. Lewis was President and Chief Executive Officer of KMart since October 2004. Mr. Lewis was Chief Multi-Branding and Operating Officer of YUM! Brands, Inc., a franchisor and licensor of quick service restaurants including KFC, Long John Silvers, Pizza Hut, Taco Bell and A&W, from 2003 until October 2004, Chief Operating Officer of YUM! Brands from 2000 until 2003 and Chief Operating Officer of Pizza Hut from 1996 to 1997. He also serves on the board of directors of The Walt Disney Company. Mr. Lewis has been a director of the Company since September 2016 and previously served on the Starwood board of directors from 2013 to September 2016.

**Defendant Muñoz**

64.     Defendant George Muñoz ("Muñoz") has served as a Company director since 2002 and is a member of the Audit Committee. According to the 2018 Proxy Statement, as of January 31, 2018, Defendant Muñoz beneficially owned 64,269 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $147.34, Muñoz owned approximately $9.5 million worth of Marriott stock.

65.     For the fiscal year ended December 31, 2017, Defendant Muñoz received $230,385 in compensation from the Company, comprised of $66,017 in fees earned or paid in cash, $140,010 in stock awards, $1,444 in change in pension value and nonqualified deferred compensation earnings, and $22,914 in all other compensation.

66.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Muñoz made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Average Price | Proceeds |
|------|------------------|---------------|----------|
| May 15, 2017 | 5,894 | $   103.95 | $      612,672 |

Thus, in total, before the fraud was exposed, he sold 5,894 Company shares on inside information, for which he received approximately $612,672. His insider sales made with knowledge of material

non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

67.     The Company's 2018 Proxy Statement stated the following about Defendant Muñoz:

> Mr. Muñoz has been a principal in the Washington, D.C.-based investment banking firm Muñoz Investment Banking Group, LLC since 2001. He has also been a partner in the Chicago-based law firm Tobin, Petkus & Muñoz LLC (now Tobin & Muñoz) since 2002. He served as President and Chief Executive Officer of Overseas Private Investment Corporation from 1997 to 2001. Mr. Muñoz was Chief Financial Officer and Assistant Secretary of the U.S. Treasury Department from 1993 until 1997. Mr. Muñoz is a certified public accountant and an attorney. He serves on the board of directors of Altria Group, Inc., Anixter International, Inc., and Laureate Education, Inc. He also serves on the board of trustees of the National Geographic Society. Mr. Muñoz has been a director of the Company since 2002.

### Defendant Reinemund

68.     Defendant Steven S Reinemund ("Reinemund") has served as a Company director since 2007, and is the Chair of the Compensation Policy Committee. According to the 2018 Proxy Statement, as of January 31, 2018, Defendant Reinemund beneficially owned 32,563 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $147.34, Reinemund owned approximately $4.8 million worth of Marriott stock.

69.     For the fiscal year ended December 31, 2017, Defendant Reinemund received $239,496 in compensation from the Company, comprised of $95,000 in fees earned or paid in cash, $140,010 in stock awards, $2,080 in change in pension value and nonqualified deferred compensation earnings, and $2,406 in all other compensation.

70.     The Company's 2018 Proxy Statement stated the following about Defendant Reinemund:

Mr. Reinemund served as the Dean of Business at Wake Forest University from July 2008 until June 2014. In 2007, Mr. Reinemund retired from PepsiCo, Inc., a multinational food and beverage company, where he served as Chairman and Chief Executive Officer from 2001 until 2006 and Chairman until May 2007. He joined PepsiCo in 1984 and held the positions of President and Chief Executive Officer Pizza Hut, Chairman and Chief Executive Officer Frito-Lay and President and Chief Operating Officer PepsiCo. He was a director of PepsiCo from 1996 until 2007. Mr. Reinemund serves on the board of directors of Chick-fil-A, Inc., ExxonMobil Corp., and Walmart, Inc. He was also a director of American Express Company from 2007 to 2015. Mr. Reinemund is also a member of the board of directors of the Cooper Clinic Institute and serves on the board of trustees of Wake Forest University and the United States Naval Academy Foundation, and on the board of governors of the Center of Creative Leadership. Mr. Reinemund has been a director of the Company since 2007.

### Defendant Schwab

71.     Defendant Susan Schwab ("Schwab") has served as a Company director since May 2015, and is a member of the Compensation Policy Committee. According to the 2018 Proxy Statement, as of January 31, 2018, Defendant Schwab beneficially owned 5,855 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 31, 2018 was $147.34, Schwab owned approximately $862,676 worth of Marriott stock.

72.     For the fiscal year ended December 31, 2017, Defendant Schwab received $228,253 in compensation from the Company, comprised of $85,000 in fees earned or paid in cash, $140,010 in stock awards, $55 in change in pension value and nonqualified deferred compensation earnings, and $3,188 in all other compensation.

73.     The Company's 2018 Proxy Statement stated the following about Defendant Schwab:

Ambassador Schwab has been a Professor at the University of Maryland School of Public Policy since January 2009 and a strategic advisor to Mayer Brown, LLP (global law firm) since March 2010. She served as U.S. Trade Representative from June 2006 to January 2009 and as Deputy U.S. Trade Representative from October 2005 to June 2006. Prior to her service as Deputy U.S. Trade Representative,

Ambassador Schwab served as President and Chief Executive Officer of the University System of Maryland Foundation from June 2004 to October 2005, as a consultant for the U.S. Department of Treasury from July 2003 to December 2003 and as Dean of the University of Maryland School of Public Policy from July 1995 to July 2003. Ambassador Schwab also serves on the board of directors of The Boeing Company, Caterpillar Inc. and FedEx Corporation. She joined the Board in 2015.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

74.     By reason of their positions as officers, directors, and/or fiduciaries of Marriott and because of their ability to control the business and corporate affairs of Marriott, the Individual Defendants owed Marriott and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Marriott in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Marriott and its shareholders so as to benefit all shareholders equally.

75.     Each director and officer of the Company owes to Marriott and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

76.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Marriott, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

77.     To discharge their duties, the officers and directors of Marriott were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

78.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Marriott, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Marriott's Board at all relevant times.

79.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

80.     To discharge their duties, the officers and directors of Marriott were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of Marriott were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Maryland and the United States, and pursuant to Marriott's own Business Conduct Guide;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Marriott conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Marriott and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Marriott's operations would comply with all applicable laws and Marriott's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)　　　refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)　　　examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

81.　　　Each of the Individual Defendants further owed to Marriott and the shareholders the duty of loyalty requiring that each favor Marriott's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

82.　　　At all times relevant hereto, the Individual Defendants were the agents of each other and of Marriott and were at all times acting within the course and scope of such agency.

83.　　　Because of their advisory, executive, managerial, and directorial positions with Marriott, each of the Individual Defendants had access to adverse, non-public information about the Company.

84.　　　The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Marriott.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

85.　　　In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

86.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while the Company repurchased its own stock.

87.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are, or were at relevant times, directors of Marriott, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

88.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

89.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Marriott and was at all times acting within the course and scope of such agency.

## MARRIOTT'S CODE OF ETHICS

90.     The Company's Business Conduct Guide (the "Code of Ethics"), applies to, *inter alia*, the Company's officers and directors, stating, in relevant part:

> As Marriott associates, officers, directors, or other persons acting on behalf of Marriott (collectively "associates"), you are expected to be familiar with and work within the code of business conduct detailed in this Business Conduct Guide.

91.     Regarding "Accurate Books, Records, and Reports," the Code of Ethics provides, in relevant part, that:

> Be honest and act with integrity in all communications … in every record created and in all data entered, from financial information and personal resumés to quality and safety reports. Our books, records, and reports are only as accurate as the data from which they are derived.

> * * *

> Make certain that all information and reports supplied to government authorities, self-regulatory organizations (such as the Financial Industry Regulatory Authority), shareholders, securities analysts, and the general public are accurate, timely, and supported by necessary documentation.

92.     With respect to "Dealing Fairly With Customers," the Code of Ethics provides that:

> As a leading worldwide hospitality company, Marriott is dedicated to providing exceptional customer service. Customers should always be treated fairly and with respect.

> Customers should be given what is promised and at the promised price. Misrepresentations about Marriott's products and services may lead to costly legal action. A false claim, a small untruth, or even a perception of dishonesty can jeopardize the loyalty and satisfaction of our customers.

> When communicating with customers and the public:

> • Be truthful, without embellishment or omission, when representing the nature and quality of Marriott's products, services, prices, contractual terms, and other information.

• Avoid even inadvertently misleading customers.

• Only make claims about Marriott's products and services that you know to be true or have adequate information to support.

93.     The Code of Ethics provides, as to "fair and ethical dealing," that:

Every employee must promote positive business relationships. ***Never gain unfair advantage by misleading, misrepresenting or deceiving***.

***We do not participate in false or deceptive advertising of*** our products, services or ***our Company***. Make sure that you are truthful and accurate in promotional materials, including advertising, sales, and marketing communications; and, ensure that you can substantiate any claims that you make.

(Emphasis added.)

94.     The Code of Ethics provides, regarding "Providing Information to the Government" in relevant part, that:

Always be truthful in providing information to the government on behalf of Marriott.

You may interact with various government agencies in many ways.

Examples include:

• Filing routine information with government agencies (e.g., tax returns, lobbying disclosure reports, securities filings)

• Participating in legal actions before agencies and courts

• Providing information in connection with special government inquiries and investigations

Making false statements in these circum-stances [sic] may harm Marriott's reputation and may result in severe penalties for both Marriott and the responsible associate.

Never attempt to obstruct a government inquiry or the administration of justice, and immediately report any such activities by others.

95.     The Code of Ethics provides, as to "Protecting Confidential Information," that:

Everyone is responsible for protecting the confidentiality of Marriott's proprietary information, except when disclosure is authorized or legally mandated.

This duty applies to all associates. It applies during both working and nonworking hours and extends beyond your employment with Marriott.

Do not share Marriott's confidential information with: 1) associates who are not authorized to receive it or do not have a business need for the information; or 2) persons outside Marriott, unless there is a legitimate and authorized business purpose for the disclosure, or unless disclosure is required by law.

**Confidential Information Includes:**

• Information that derives value from not being known to the public

• Undisclosed or commercially sensitive information that might be of use to Marriott's competitors

• Information that might harm Marriott, our shareholders, our customers, or our associates, if disclosed

**Examples of Confidential Information:**

• ***Personal and financial information concerning customers or associates***

\* \* \*

**Defer to Designated Persons**

To protect Marriott and our shareholders and to ensure compliance with the law, decisions related to disclosing commercially sensitive business information and other nonpublic information should be made only by designated persons and coordinated with the Communications Department.

Never share information about Marriott with the news media, government officials, shareholders, securities analysts, other interested persons, or the public, without proper authorization or as required by law.

(Bold subheadings in original, bold & italic emphasis added.)

96.     The Code of Ethics provides, as to "Insider Trading" that:

It is illegal to use material nonpublic information to make personal investment ***decisions to buy, sell, or trade in securities such as stocks, bonds, and options.***

***This is considered insider trading and applies to associates, officers, and directors who have access to nonpublic information about Marriott*** or our business partners, customers, contractors, and suppliers.

The ban on insider trading includes using material nonpublic information to recommend investment decisions or to provide it to others to assist them in their investment decisions.

"Inside information" may include, but is not limited to:

• Information regarding upcoming mergers and acquisitions

• Changes in critical management

• Undisclosed financial results

• Development of new products and services

In the event of an inadvertent disclosure of inside information, immediately report the facts to the Marriott Law Department.

(Emphasis added.)

97.     Regarding "Protecting Marriott's Reputation," the Code of Ethics provides, in relevant part: "***You must avoid any*** communication, ***disclosure***, or interaction ***that might*** disparage, defame, or ***damage Marriott's reputation***, associates, customers, vendors, or other business partners, or that might fail to serve the best interests of our shareholders."[6]

98.     Regarding "Customer and Associate Privacy," the Code of Ethics provides, in relevant part:

There are strict policies concerning the disclosure of information about Marriott guests and associates.

There are only limited circumstances in which the private information of associates or customers may be disclosed outside of Marriott.

You are responsible for reviewing and understanding Marriott policies before you release information about Marriott customers and associates. Other than the exceptions expressly identified in Marriott policies, you may not disclose records and information concerning present or former customers or associates.

***This private information includes any Personally Identifiable Information (PII), which can be associated with or traced to an individual***, such as:

---

[6] Emphasis added.

> *Name, address, telephone number, e-mail address, government issued identifications (e.g., Social Security number), health records, credit card information, or other financial information*
>
> ***Information concerning customers and associates must be safeguarded and should be used only for legitimate business purposes and should not be shared***, even within Marriott, except on a need-to-know basis.

(Italicized text in original. Emphasis added in bold & italics.)

99.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Several of the Individual Defendants violated the code by selling shares of Company stock while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, protect customer information and the Company's reputation, or conduct business in an honest and ethical manner.

## MARRIOTT'S AUDIT COMMITTEE CHARTER

100.     The Company also has an Audit Committee Charter, published on its website, which outlines the responsibilities of the Audit Committee. The Audit Committee's responsibilities include risk assessment, and the Audit Committee Charter states, in relevant part:

> The Committee will periodically review and discuss the Company's business and financial risk management and risk assessment policies and procedures with senior management, the Independent Auditor, and the Chief Audit Executive.

101.     The Audit Committee's responsibilities also include the following with respect to internal controls:

> The Committee will periodically review and discuss with the internal auditors and the Principal Independent Auditor the adequacy and effectiveness of the

34

Company's internal control environment, including any significant deficiencies or material weaknesses and any significant changes in internal controls that are required to be disclosed in the Company's periodic filings. The Committee will also review the annual report of the Principal Independent Auditor on the Company's internal controls over financial reporting. In connection with this review, the Committee will obtain and discuss:

1. Reports from the Chief Executive Officer, the Chief Financial Officer, and the Principal Independent Auditor on any significant deficiencies in the design or operation of internal controls with the identification of any material weakness;

2. Any fraud or other irregularity (whether or not material) that involves management or other employees who have a significant role in the Company's internal control environment; and

3. Management's evaluations of the Company's internal controls over financial reporting and disclosure controls and procedures.

102.    In violation of their duties as members of the Audit Committee, Defendants Henderson, Lewis and Muñoz, failed to effectively review and discuss risks associated with cybersecurity, and failed to effectively review and discuss with the independent auditor the adequacy and effectiveness of the Company's internal controls.

## **BACKGROUND**

103.    On September 23, 2016, Marriott completed the Starwood Acquisition. Starwood shareholders received $21.00 in cash and 0.800 shares of Marriott common stock, for total consideration of $13.6 billion.

104.    Marriott is, following the Starwood Acquisition, the largest multinational chain of hotels in the world.

105.    In the course of conducting business, the Company collects personally identifying information ("PII") of customers, including, *inter alia*, names, genders, credit card numbers, and

passport numbers. As articulated in the Privacy Policy posted on the Company's website,[7] the Company collects the following PII:

- Name

- Gender

- Postal address

- Telephone number

- Email address

- Credit and debit card number or other payment data

- Financial information in limited circumstances

- Language preference

- Date and place of birth

- Nationality, passport, visa or other government-issued identification data

- Important dates, such as birthdays, anniversaries and special occasions

- Membership or loyalty program data (including co-branded payment cards, travel partner program affiliations)

- Employer details

- Travel itinerary, tour group or activity data

- Prior guest stays or interactions, goods and services purchased, special service and amenity requests

- Geolocation information

- Social media account ID, profile photo and other data publicly available, or data made available by linking your social media and loyalty accounts

106.    The Privacy Policy continues, clarifying that the Company also collects:

- Data about family members and companions, such as names and ages of children

---

[7] https://www.marriott.com/about/privacy.mi. Last updated May 18, 2018.

- Biometric data, such as digital images

- Images and video and audio data via: (a) security cameras located in public areas, such as hallways and lobbies, in our properties; and (b) body-worn cameras carried by our loss prevention officers and other security personnel

- Guest preferences and personalized data ("**Personal Preferences**"),[8] such as your interests, activities, hobbies, food and beverage choices, services and amenities of which you advise us or which we learn about during your visit

107.    The Privacy Policy further assures customers that "[w]e seek to use reasonable organizational, technical and administrative measures to protect Personal Data."

**The Data Breach**

108.    On September 8, 2018, the Company received an internal alert from a security tool regarding an attempted access to Starwood's United States guest reservation database. Purportedly between September 2018 and November 2018, the Company discovered there had been unauthorized access to Starwood's network since 2014 following Marriot's investigation into the September 8, 2018 security alert.

109.    In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly caused the Company to permit and/or fail to prevent the Data Breach, despite the Company's assurance that it sought to use reasonable measures to protect its customers' personal information. As a result of the Data Breach, the Individual Defendants caused the Company to expose customer data to third parties without authorization, indicating that the Company had lax or non-existent data and security policies and protocols, and that the Company's security systems were ultimately inadequate to protect customer data.

110.    The Individual Defendants were – and at all relevant times have been – aware that PII collected by the Company is highly sensitive and could be used for illicit and nefarious

---

[8] Emphasis in original unless otherwise noted throughout.

purposes by third parties, including perpetuating identity theft and engaging in fraudulent transactions.

111.    Beyond their general duties to ensure effective systems are in place to protect customers' information to prevent the risk of loss, the Individual Defendants were – and at all relevant times have been – obligated to oversee the Company's compliance with rules governing payment card transactions and PII, industry standards and various federal and state laws, in addition to the Company's own internal policies, procedures, and commitments.

112.    The Company has long been aware of the risk of cyber-attacks.

113.    The Company's Form 10-K for the fiscal year ended December 31, 2014, filed before the Starwood Acquisition was announced stated, in relevant part:

> *Failure to maintain the integrity of and protect internal or customer data could result in faulty business decisions, operational inefficiencies, damage to our reputation and/or subject us to costs, fines, or lawsuits.* Our businesses require collection and retention of large volumes of internal and customer data, including credit card numbers and other personally identifiable information of our customers in various information systems that we maintain and in those maintained by third parties with whom we contract to provide services, including in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. We and third parties who provide services to us also maintain personally identifiable information about our employees. The integrity and protection of that customer, employee, and company data is critical to us. If that data is inaccurate or incomplete, we could make faulty decisions. Our customers and employees also have a high expectation that we and our service providers will adequately protect their personal information. The information, security, and privacy requirements imposed by governmental regulation and the requirements of the payment card industry are also increasingly demanding, in both the United States and other jurisdictions where we operate. Our systems or our franchisees' systems may not be able to satisfy these changing requirements and employee and customer expectations, or may require significant additional investments or time in order to do so. Efforts to hack or breach security measures, failures of systems or software to operate as designed or intended, viruses, operator error, or inadvertent releases of data may materially impact our and our service providers' information systems and records. Our reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access to such systems have increased significantly in recent years. A significant theft, loss, or fraudulent use of customer, employee, or

company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation. Breaches in the security of our information systems or those of our franchisees or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits.

114.    The Company's Form 10-K for the fiscal year ended December 31, 2015, filed

before the Starwood Acquisition was completed stated, in relevant part:

> *Cyber-attacks could have a disruptive effect on our business.* Efforts to hack or breach security measures, failures of systems or software to operate as designed or intended, viruses, operator error, or inadvertent releases of data may materially impact our, including our owners', franchisees', licensees', or service providers', information systems and records. Our reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access to such systems have increased significantly in recent years. A significant theft, loss, or fraudulent use of customer, employee, or company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation. Breaches in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits. In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, such insurance coverage may be insufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security breaches, and other related breaches.

115.    Indeed, numerous large and high-profile data breaches have occurred in recent

years, causing significant monetary and reputational damage to large, multinational corporations

such as Marriott. Targets of such breaches have included retailers The Home Depot, Inc. and

Target Corporation, credit reporting bureau Equifax Inc., health insurer Anthem, Inc., and social

media juggernaut Facebook, Inc.

116.    Data breaches have also affected other companies in the hospitality industry,

including a number of attacks in 2015 affecting Hyatt Hotels Corp., The Trump Hotel Collection,

Mandarin Oriental, White Lodging Services Corporation, and Starwood.

117.   Data security issues at Starwood were known prior to the completion of the

Starwood Acquisition. As stated in a December 8, 2015 article published by *Skift*:

> **Starwood Hotels & Resorts.** Not long after Marriott announced in mid-November
> [2015] that it would acquire Starwood, the latter stated that hackers gained access
> to credit and debit card information of customers who dined or shopped at 54 of its
> hotels due to malware that infected sales systems in hotel gift shops, restaurants,
> and stores. The breach did not occur at front desk payment systems. Several
> Sheraton, Westin, and W Hotels were affected.

Thus, at the time of the Starwood Acquisition, the Individual Defendants knew, or were reckless

in not knowing, that Starwood's data security systems had material deficiencies.

118.   The Company's Board bears responsibility for risk oversight, including the

oversight of cybersecurity risks. As articulated in the 2018 Proxy Statement:

> The Board of Directors is responsible for overseeing the Company's processes for
> assessing and managing risk. The Board considers our risk profile when reviewing
> our annual business plan and incorporates risk assessment into its decisions
> impacting the Company. In performing its oversight responsibilities, the Board
> receives an annual risk assessment report from the Chief Financial Officer and
> discusses the most significant risks facing the Company. *As part of this annual
> review, the Board reviews the Company's cybersecurity risk profile and is
> informed on the specifics of the cybersecurity risk program in a separate annual
> presentation by the Company's Chief Information Officer. This program
> provides the Board with an overview of the cybersecurity risks and threats
> landscape as well as reviews the Company's risk posture. The Board is further
> briefed on actions and changes taken by management to mitigate the Company's
> risk profile and provided with an overview of the cybersecurity strategy along
> with key cybersecurity initiatives and incidents.*

(Emphasis added.)

119.   The 2018 Proxy Statement further notes that the Audit Committee and the

Compensation and Policy Committee play important roles in risk management, stating, in relevant

part:

> The Board also has delegated certain risk oversight functions to the Audit
> Committee. In accordance with its charter, the Audit Committee periodically
> reviews and discusses the Company's business and financial risk management and
> risk assessment policies and procedures with senior management, the Company's

independent auditor, and the Chief Audit Executive. The Audit Committee incorporates its risk oversight function into its regular reports to the Board.

In addition, the Compensation Policy Committee reviewed a risk assessment to determine whether the amount and components of compensation for the Company's associates and the design of compensation programs might create incentives for excessive risk-taking by the Company's associates. As explained in the CD&A below, the Compensation Policy Committee believes that our compensation programs encourage associates, including our executives, to remain focused on a balance of the short- and long-term operational and financial goals of the Company, and thereby reduces the potential for actions that involve an excessive level of risk.

120.    The Company filed a Form 8-K with the SEC on September 23, 2016, announcing that it had completed the acquisition of Starwood.

121.    However, as would later be revealed on November 30, 2018, in breach of their fiduciary duties, the Individual Defendants knowingly or recklessly caused the Company to permit or fail to prevent the Data Breach. The Individual Defendants failed to conduct adequate due diligence in connection with the Starwood Acquisition, causing them to fail to discover that a security vulnerability existed in Starwood's guest reservation database in the United States. As a result of said vulnerability, certain actors had gained unauthorized access to Starwood's network since 2014. In further breach of their fiduciary duties, they made the false and misleading statements below concerning, *inter alia*, the Data Breach.

**False and Misleading Statements During the Relevant Period**

*Q3 2016 10-Q*

122.    On November 9, 2016, the Company filed with the SEC its report for the fiscal quarter ended September 30, 2016 on Form 10-Q (the "Q3 2016 10-Q"), which was signed by Defendant Bauduin.

123.    The Q3 2016 10-Q stated the following regarding customer data, creating the impression that the Company securely maintained customer data:

Our businesses process, use, and transmit large volumes of internal employee and customer data, including credit card numbers and other personal information in various information systems that we maintain and in those maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. The integrity and protection of that customer, employee, and company data is critical to our business. If that data is inaccurate or incomplete, we could make faulty decisions.

Our customers and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information.

124.    Attached to the Q3 2016 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Sorenson and Oberg attesting to the accuracy of the Q3 2016 10-Q.

### 2016 10-K

125.    On February 21, 2017, the Company filed with the SEC its report for the fiscal quarter and year ended December 31, 2016 on a Form 10-K (the "2016 10-K"), which was signed by Defendants Sorenson, Oberg, Bauduin, J.W. Marriott, Duncan, Harrison, Henderson, Hippeau, Kellner, Lee, Lewis, Muñoz, Reinemund, and Schwab, and non-parties Mary K. Bush ("Bush") and W. Mitt Romney ("Romney").

126.    The 2016 10-K stated the following regarding customer data, creating the impression that the Company securely maintained customer data:

Our businesses process, use, and transmit large volumes of internal employee and customer data, including credit card numbers and other personal information in various information systems that we maintain and in those maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. The integrity and protection of that customer, employee, and company data is critical to our business. If that data is inaccurate or incomplete, we could make faulty decisions.

Our customers and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information. The information, security, and privacy requirements imposed

by governmental regulation and the requirements of the payment card industry are also increasingly demanding, in both the United States and other jurisdictions where we operate.

127.     The 2016 10-K asserted that management had concluded that the Company's

internal control over financial reporting was effective as of December 31, 2016, stating, in relevant

part:

> As of the end of the period covered by this annual report, we evaluated, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")). Management necessarily applied its judgment in assessing the costs and benefits of those controls and procedures, which by their nature, can provide only reasonable assurance about management's control objectives. You should note that the design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and we cannot assure you that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote. Based upon this evaluation, our Chief Executive Officer and the Chief Financial Officer concluded that our disclosure controls and procedures were effective and operating to provide reasonable assurance that we record, process, summarize and report the information we are required to disclose in the reports that we file or submit under the Exchange Act within the time periods specified in the rules and forms of the SEC, and to provide reasonable assurance that we accumulate and communicate such information to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions about required disclosure.

> The scope of management's assessment of the effectiveness of the design and operation of the Company's disclosure controls and procedures as of December 31, 2016 includes all of the Company's consolidated operations except for those disclosure controls and procedures of Starwood that are subsumed by internal control over financial reporting.

128.     Attached to the 2016 10-K were SOX certifications signed by Defendants Sorenson

and Oberg attesting to the accuracy of the 2016 10-K.

### 2017 Proxy Statement

129.     On April 5, 2017, the Company filed a Schedule 14A filed with the SEC (the "2017

Proxy Statement"). Defendants Sorenson, J.W. Marriott, Duncan, Harrison, Henderson, Hippeau,

Kellner, Lee, Lewis, Muñoz, Reinemund, and Schwab solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[9]

130.    Regarding the Company's Code of Ethics, the 2017 Proxy Statement noted that:

> The Company has long maintained and enforced a Code of Ethics that applies to all Marriott associates, including our Chairman of the Board, Chief Executive Officer, Chief Financial Officer and Principal Accounting Officer and to each member of the Board. The Code of Ethics is encompassed in our Business Conduct Guide, which is available in the Investor Relations section of our website (www.marriott.com/investor) by clicking on "Corporate Governance" and then "Documents & Charters." We will post on that website any future changes or amendments to our Code of Ethics, and any waiver of our Code of Ethics that applies to our Chairman of the Board, any of our executive officers, or a member of our Board within four business days following the date of the amendment or waiver.

131.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed, as the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, failed to maintain the accuracy of Company records and reports, comply with laws and regulations, protect customer information and the Company's reputation, or conduct business in an honest and ethical manner. Further, multiple Individual Defendants violated the code by selling shares of Company stock while in possession of material, non-public information about the Company.

---

[9] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

132.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including stock awards based on earnings per share, while failing to disclose that such measures were being artificially inflated by the Individual Defendants' false and misleading statements and repurchases of Company stock, and therefore any compensation based on the Company's financial performance was artificially inflated.

133.    The 2017 Proxy Statement also failed to disclose that: (1) the Company did not maintain customer's personal data on a secure system; (2) unknown actors had gained unauthorized access to Starwood's network since 2014; (3) Marriott's due diligence in the Starwood Acquisition failed to discover the Data Breach; (4) the Data Breach caused personal information of up to 500 million guests to be exposed; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing the Company's public statements were materially false and misleading at all relevant times.

### *2017 10-K*

134.    On February 15, 2018, the Company filed with the SEC its report for the fiscal year and quarter ended December 31, 2017 on Form 10-K (the "2017 10-K"), which was signed by Defendants Sorenson, Oberg, Bauduin, J.W. Marriott, Duncan, Harrison, Henderson, Hippeau, Kellner, Lee, Lewis, Muñoz, Reinemund, and Schwab, and non-parties Bush and Romney.

135.    The 2016 10-K stated the following regarding customer data, creating the impression that the Company securely maintained customer data:

> Our businesses process, use, and transmit large volumes of employee and guest data, including credit card numbers and other personal information in various information systems that we maintain and in systems maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. The integrity and protection of that guest, employee,

and company data is critical to our business. If that data is inaccurate or incomplete, we could make faulty decisions.

Our guests and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information. The information, security, and privacy requirements imposed by laws and governmental regulation and the requirements of the payment card industry are also increasingly demanding, in the U.S., the European Union, Asia, and other jurisdictions where we operate.

136.    The 2017 10-K asserted that management had concluded that the Company's internal control over financial reporting was effective as of December 31, 2017, stating, in relevant part:

> As of the end of the period covered by this annual report, we evaluated, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")). Management necessarily applied its judgment in assessing the costs and benefits of those controls and procedures, which by their nature, can provide only reasonable assurance about management's control objectives. You should note that the design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and we cannot assure you that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote. Based upon this evaluation, our Chief Executive Officer and the Chief Financial Officer concluded that our disclosure controls and procedures were effective and operating to provide reasonable assurance that we record, process, summarize and report the information we are required to disclose in the reports that we file or submit under the Exchange Act within the time periods specified in the rules and forms of the SEC, and to provide reasonable assurance that we accumulate and communicate such information to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions about required disclosure.

137.    Attached to the 2017 10-K were SOX certifications signed by Defendants Sorenson and Oberg attesting to its accuracy.

### 2018 Proxy Statement

138.    On April 5, 2018, the Company filed a Schedule 14A filed with the SEC (the "2018 Proxy Statement"). Defendants Sorenson, J.W. Marriott, Duncan, Harrison, Henderson, Hippeau,

Kellner, Lee, Lewis, Muñoz, Reinemund, and Schwab solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[10]

139.    Regarding the Company's Code of Ethics, the 2018 Proxy Statement noted that:

The Company has long maintained and enforced a Code of Ethics that applies to all Marriott associates, including our Chairman of the Board, Chief Executive Officer, Chief Financial Officer and Principal Accounting Officer and to each member of the Board. The Code of Ethics is encompassed in our Business Conduct Guide, which is available in the Investor Relations section of our website (www.marriott.com/investor) by clicking on "Corporate Governance" and then "Documents & Charters." We will post on that website any future changes or amendments to our Code of Ethics, and any waiver of our Code of Ethics that applies to our Chairman of the Board, any of our executive officers, or a member of our Board within four business days following the date of the amendment or waiver.

140.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed, as the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, failed to maintain the accuracy of Company records and reports, comply with laws and regulations, protect customer information and the Company's reputation, or conduct business in an honest and ethical manner. Further, multiple Individual Defendants violated the code by selling shares of Company stock while in possession of material, non-public information about the Company.

---

[10] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

141.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including stock awards based on earnings per share, while failing to disclose that such measures were being artificially inflated by the Individual Defendants' false and misleading statements and repurchases of Company stock, and therefore any compensation based on the Company's financial performance was artificially inflated.

142.    Further, the 2018 Proxy Statement revealed that the Company approved bonuses for certain named executive officers, including $1 million for Defendant Sorensen, "to reward senior management for its outstanding performance in 2017 regarding the ongoing seamless integration of Starwood." Such bonuses were unwarranted and unjustified as a result of the breaches of fiduciary duty in evaluating and approving the Starwood Acquisition, which led the Company to fail to uncover a data breach that had been ongoing for over a year and would subject the Company to significant expenses and liabilities. Regarding these bonuses, the 2018 Proxy Statement stated, in relevant part:

> ***Taking into consideration*** the unique nature of the Starwood combination and ***the Company's success in maintaining strong quality and brand control over our legacy Marriott operations while maintaining the brand reputation and managing the successful integration of the Starwood operations, and the management team's success in building stockholder value through this transformative merger, the [Compensation and Policy] Committee approved a one-time supplemental cash bonus for 2017 in the amount of $500,000 to each of the NEOs and the Board approved a one-time supplemental cash bonus for 2017 in the amount of $1,000,000 for Mr. Sorenson.*** The purpose of the bonus is ***to reward senior management for its outstanding performance in 2017 regarding the ongoing seamless integration of Starwood*** while promoting strong performance in the Company's legacy operations. In particular, the Board cited strong performance across a broad array of criteria, including high levels of associate engagement, human capital development, completion of co-branded credit card deals, successful asset sales, work toward linking and combining loyalty programs, and progress toward improved leverage in the competitive marketplace. . . . The supplemental cash bonus amounts were determined by the Committee with the objective that the award would result in

compensation for each of the NEOs that is well-aligned with the Company's pay-for-performance philosophy and exceptionally strong 2017 performance.

(Emphasis added.)

143.    The 2018 Proxy Statement also failed to disclose that: (1) the Company did not maintain customer's personal data on a secure system; (2) unknown actors had gained unauthorized access to Starwood's network since 2014; (3) Marriott's due diligence in the Starwood Acquisition failed to discover the Data Breach; (4) the Data Breach caused personal information of up to 500 million guests to be exposed; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing the Company's public statements were materially false and misleading at all relevant times.

### Q3 2018 10-Q

144.    On November 6, 2018, the Company filed with the SEC its report for the fiscal quarter ended September 30, 2018 on Form 10-Q (the "Q3 2018 10-Q"), which was signed by Defendant Bauduin.

145.    Despite the Company having received notification of a potential data breach on September 8, 2018, and launched an investigation related thereto, the Q3 2018 10-Q misleadingly presented then-existing security risks as potential risks, including the following statement regarding customer data:

> In the operation of our business, we collect, store, use, and transmit large volumes of data regarding associates, guests, customers, owners, licensees, franchisees, and our own business operations, including credit card numbers, reservation and loyalty data, and other personal information, in various information systems that we maintain and in systems maintained by third parties, including our owners, franchisees, licensees, and service providers. The integrity and protection of this data is critical to our business. If this data is inaccurate or incomplete, we could make faulty decisions.

Our guests and associates also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect and appropriately use their personal information. The information, security, and privacy requirements imposed by laws and governmental regulation, our contractual obligations, and the requirements of the payment card industry are also increasingly demanding in the U.S., the European Union, Asia, and other jurisdictions where we operate. Our systems and the systems maintained or used by our owners, franchisees, licensees, and service providers may not be able to satisfy these changing legal and regulatory requirements and associate and guest expectations, or may require significant additional investments or time to do so. We may incur significant additional costs to meet these requirements, obligations, and expectations, and in the event of alleged or actual noncompliance we may experience increased operating costs, increased exposure to fines and litigation, and increased risk of damage to our reputation and brand.

146.    The Q3 2018 10-Q misleadingly stating the following regarding cyber-security incidents, characterizing then-existing risks as potential risks, especially in light of the fact that the Company had received notice of a threat on September 8, 2018, prior to filing the Q3 2018 10-Q:

*Cyber security incidents could have a disruptive effect on our business.* We have implemented security measures to safeguard our systems and data, and we may implement additional measures in the future, but our measures or the measures of our service providers or our owners, franchisees, licensees, and their service providers may not be sufficient to maintain the confidentiality, security, or availability of the data we collect, store, and use to operate our business. Efforts to hack or circumvent security measures, efforts to gain unauthorized access to data, failures of systems or software to operate as designed or intended, viruses, "ransomware" or other malware, "phishing" or other types of business email compromises, operator error, or inadvertent releases of data may materially impact our information systems and records and those of our owners, franchisees, licensees, or service providers. Our reliance on computer, Internet-based, and mobile systems and communications and the frequency and sophistication of efforts by third parties to gain unauthorized access or prevent authorized access to such systems have greatly increased in recent years. Like most large multinational corporations, we have experienced cyber-attacks, attempts to disrupt access to our systems and data, and attempts to affect the integrity of our data, and the frequency and sophistication of such efforts could continue to increase. Although some of these efforts may not be successful or impactful, a significant theft, loss, loss of access to, or fraudulent use of guest, associate, owner, franchisee, licensee, or company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation. Depending on the nature and scope of the event, compromises in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in

operational inefficiencies and a loss of profits, and negative publicity, resulting in tangible adverse effects on our business, including consumer boycotts, lost sales, litigation, loss of development opportunities, or associate retention and recruiting difficulties, all of which could affect our market share, reputation, business, financial condition, or results of operations. The techniques used to obtain unauthorized access, disable or degrade service, or sabotage information systems change frequently, can be difficult to detect for long periods of time, and can involve difficult or prolonged assessment or remediation periods even once detected, which could magnify the severity of these adverse effects. In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, that insurance coverage may not be sufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security compromises, and other related incidents. Furthermore, in the future such insurance may not be available to us on commercially reasonable terms, or at all.

147.    The Q3 2018 10-Q asserted that management had concluded that the Company's

internal control over financial reporting was effective as of September 30, 2018, stating, in relevant

part:

As of the end of the period covered by this quarterly report, we evaluated, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")). Management necessarily applied its judgment in assessing the costs and benefits of those controls and procedures, which by their nature, can provide only reasonable assurance about management's control objectives. You should note that the design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and we cannot assure you that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote. Based upon this evaluation, our Chief Executive Officer and the Chief Financial Officer concluded that our disclosure controls and procedures were effective and operating to provide reasonable assurance that we record, process, summarize, and report the information we are required to disclose in the reports that we file or submit under the Exchange Act within the time periods specified in the rules and forms of the SEC, and to provide reasonable assurance that we accumulate and communicate such information to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions about required disclosure.

148.    Attached to the Q3 2018 10-Q were SOX certifications signed by Defendants

Sorenson and Oberg attesting to its accuracy.

149.    The statements in ¶¶ 122-128, 134-137, and 144-148 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the Company did not maintain customer's personal data on a secure system; (2) unknown actors had gained unauthorized access to Starwood's network since 2014; (3) Marriott's due diligence in the Starwood Acquisition failed to discover the Data Breach; (4) the Data Breach caused personal information of up to 500 million guests to be exposed; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

*November 30, 2018 Press Release*

150.    On November 30, 2018, before markets opened, the Individual Defendants caused the Company to issue a press release titled "Marriott Announces Starwood Guest Reservation Database Security Incident." The press release revealed that following a September 8, 2018 alert, the Company had launched an investigation and determined that a data breach and compromised information in the Starwood guest reservation database.

151.    The press release sated, in relevant part:

BETHESDA, MD - November 30, 2018 - Marriott has taken measures to investigate and address a data security incident involving the Starwood guest reservation database. On November 19, 2018, the investigation determined that there was unauthorized access to the database, which contained guest information relating to reservations at Starwood properties[11] on or before September 10, 2018.

***On September 8, 2018, Marriott received an alert from an internal security tool regarding an attempt to access the Starwood guest reservation database in the***

_____

[11] The press release noted that "Starwood brands include: W Hotels, St. Regis, Sheraton Hotels & Resorts, Westin Hotels & Resorts, Element Hotels, Aloft Hotels, The Luxury Collection, Tribute Portfolio, Le Méridien Hotels & Resorts, Four Points by Sheraton and Design Hotels. Starwood branded timeshare properties are also included."

***United States***. Marriott quickly engaged leading security experts to help determine what occurred. ***<u>Marriott learned during the investigation that there had been unauthorized access to the Starwood network since 2014</u>***. The company recently discovered that an unauthorized party had copied and encrypted information, and took steps towards removing it. ***On November 19, 2018, Marriott was able to decrypt the information and determined that the contents were from the Starwood guest reservation database***.

***The company has not finished identifying duplicate information in the database, but believes it contains information on up to approximately 500 million guests who made a reservation at a Starwood property. For approximately 327 million of these guests, the information includes some combination of name, mailing address, phone number, email address, passport number, Starwood Preferred Guest ("SPG") account information, date of birth, gender***, arrival and departure information, reservation date, and communication preferences. ***For some, the information also includes payment card numbers and payment card expiration dates***, but the payment card numbers were encrypted using Advanced Encryption Standard encryption (AES-128). ***There are two components needed to decrypt the payment card numbers, and at this point, Marriott has not been able to rule out the possibility that both were taken***. For the remaining guests, the information was limited to name and sometimes other data such as mailing address, email address, or other information.

Marriott reported this incident to law enforcement and continues to support their investigation. The company has already begun notifying regulatory authorities.

(Emphasis added.)

152.    The press release continued, quoting Defendant Sorenson as stating:

We deeply regret this incident happened . . . We fell short of what our guests deserve and what we expect of ourselves. We are doing everything we can to support our guests, and using lessons learned to be better moving forward.

Today, Marriott is reaffirming our commitment to our guests around the world. We are working hard to ensure our guests have answers to questions about their personal information, with a dedicated website and call center. We will also continue to support the efforts of law enforcement and to work with leading security experts to improve. Finally, we are devoting the resources necessary to phase out Starwood systems and accelerate the ongoing security enhancements to our network . . .

(Emphasis added.)

153.    Finally, the press release revealed that the Company would take the following steps

in response to the data breach (the "Response Measures"):

**Dedicated Website and Call Center**

- We have established a dedicated website (info.starwoodhotels.com) and call center to answer questions you may have about this incident. The frequently-asked questions on info.starwoodhotels.com may be supplemented from time to time. The call center is open seven days a week and is available in multiple languages. Call volume may be high, and we appreciate your patience.

**Email Notification**

- Marriott will begin sending emails on a rolling basis starting today, November 30, 2018, to affected guests whose email addresses are in the Starwood guest reservation database.

**Free WebWatcher Enrollment**

- Marriott is providing guests the opportunity to enroll in WebWatcher free of charge for one year. WebWatcher monitors internet sites where personal information is shared and generates an alert to the consumer if evidence of the consumer's personal information is found. Due to regulatory and other reasons, WebWatcher or similar products are not available in all countries. Guests from the United States who activate WebWatcher will also be provided fraud consultation services and reimbursement coverage for free. To activate WebWatcher, go to info.starwoodhotels.com and click on your country, if listed, for enrollment.

154. On this news, the Company's share price dropped approximately 5.6%, or $6.81, from a closing price of $121.84 per share on November 29, 2018 to close at $6.81 per share on November 30, 2018.

155. On December 3, 2018, Senators John Thune, Roger F. Wicker and Jerry Moran sent a letter to Defendant Sorenson seeking additional information regarding the data breach by no later than 5:00 P.M on December 17, 2018. Information requested includes the time at which the Company became aware of information relevant to the investigation, whether payment card information was encrypted using the AES-128 standard, and how non-payment information was secured and encrypted.

156.    On December 4, 2018, the *Los Angeles Times* published a story reporting that, following the data breach, Marriott has agreed to pay for passport replacements if it finds that customers have been victims of fraud. The article stated, in relevant part:

> After a colossal data breach that hit Marriott International and compromised sensitive personal information — including some passport numbers — of hundreds of millions of guests, the hotel company has agreed to pay for passport replacements if it finds that customers have been victims of fraud.
>
> ***The breach, which took place over four years and affected 500 million guests***, was notable not only for its scope but also for the bevy of personal information hackers accessed through the reservation system of Marriott's subsidiary, Starwood: genders, birth dates, email and mailing addresses and phone numbers, as well as some payment card information. The hackers also accessed passport numbers for a "smaller subset of customers," Marriott said.
>
> The U.S. State Department has said that its records and systems were not connected to Marriott's and that a fake passport could not be created with a passport number alone.
>
> But many experts and government officials have expressed concern that the passport numbers, in concert with the other personal data compromised by the hack, could pose serious risks of identity theft — and be a threat to national security.

157.    The article continued, stating:

> On Sunday, Senate Minority Leader Chuck Schumer (D-N.Y.) suggested that Marriott cover the $110 charge for customers requesting new passports after the breach.
>
> Marriott spokeswoman Connie Kim said in an email that although it believes the chance of hackers using passport numbers "is very low," the hotel giant is willing to foot the bill in cases it deems necessary.
>
> "We are setting up a process to work with our guests who believe that they have experienced fraud as a result of their passports being involved in this incident," Kim said. "If, through that process, we determine that fraud has taken place, then the company will reimburse guests for the costs associated with getting a new passport."

158.    Regarding the scope of the Data Breach, the *Los Angeles Times* reported:

> ***Hackers accessed the reservation system of Starwood hotels*** — which includes the Sheraton, St. Regis and Westin brands, among others — ***sometime in 2014. The breach went undetected during Marriott's acquisition of Starwood in 2016 and***

*wasn't discovered until early September of this year*. After Marriott announced the hacking attack Friday, the hotel giant was deluged with criticism about its security practices and with questions about what it was doing to protect its customers.

*New York Atty. Gen. Barbara Underwood, Maryland Atty. Gen. Brian Frosh and Pennsylvania Atty. Gen. Josh Shapiro all said their offices had opened investigations into the Marriott breach*. And for many other government officials, the breach has become a rallying cry for arguing for stricter consumer privacy regulation.

(Emphasis added.)

159.     On December 6, 2018, *USA Today* also reported that the Company had agreed to "pay for customer's new passports if they can prove fraud following the company's large-scale data breach."

160.     On December 5, 2018, C/Net reported that "[i]nvestigators believe there may have been more than one hacking group inside the guest reservation network for Marriot's Starwood division at the same time. This could make it harder to identify the culprit, as one of the sources noted."

161.     Cybersecurity experts have criticized the Company's response to the data breach. A December 3, 2018 article published by *TechCrunch* noted that the notification sent to customers whose PII may have been compromised appeared illegitimate, and the Company's response left customer's vulnerable to scammers attempting to spoof messages from the Company. Such response failures further diminish the Company's reputation and undermine consumer's trust in its brand.

## REPURCHASES DURING THE RELEVANT PERIOD

162.     During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. In total, the Company

spent an aggregate amount of approximately $3.39 billion to repurchase approximately 26 million shares of its own stock from October 2017 through September 2018.

163.    As the Company stock was actually only worth $113.50 per share, the price at closing on December 4, 2018, the Company overpaid more than $451.4 million in total for these repurchases.

164.    According to the Company's 2017 10-K, in the month of October 2017, the Individual Defendants caused the Company to repurchase 2.1 million shares of its own common stock at an average price per share of approximately $115.65, for a total cost to the Company of approximately $242.9 million.

165.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $2.15 more than the actual worth of each share during the month of October 2017. Thus, the total over payment by the Company for repurchases of its own stock during October 2017 was over $4.5 million.

166.    According to the Company's 2017 10-K, in the month of November 2017, the Individual Defendants caused the Company to repurchase 2.0 million shares of its own common stock at an average price per share of approximately $124.30, for a total cost to the Company of $248.6 million.

167.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $10.80 more than the actual worth of each share during the month of November 2017. Thus, the total over payment by the Company for repurchases of its own stock during November 2017 was $21.6 million.

168.    According to the Company's 2017 10-K, in the month of December 2017, the Individual Defendants caused the Company to repurchase 3.3 million shares of its own common stock at an average price per share of approximately $131.20, for a total cost to the Company of approximately $433 million.

169.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $17.70 more than the actual worth of each share during the month of December 2017. Thus, the total over payment by the Company for repurchases of its own stock during December 2017 was over $58.4 million.

170.    According to the Company's Form 10-Q for the fiscal quarter ended March 31, 2018, filed with the SEC on May 10, 2018 (the "Q1 2018 10-Q"), in the month of January 2018, the Individual Defendants caused the Company to repurchase 1.7 million shares of its own common stock at an average price per share of approximately $139.82, for a total cost to the Company of approximately $237.7 million.

171.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $26.32 more than the actual worth of each share during the month of January 2018. Thus, the total over payment by the Company for repurchases of its own stock during January 2018 was over $44.7 million.

172.    According to the Company's Q1 2018 10-Q, in the month of February 2018, the Individual Defendants caused the Company to repurchase 1.4 million shares of its own common stock at an average price per share of approximately $139.18, for a total cost to the Company of approximately $194.9 million.

173.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $25.68 more than the actual worth of each share during the month of February 2018. Thus, the total over payment by the Company for repurchases of its own stock during February 2018 was approximately $36 million.

174.    According to the Company's Q1 2018 10-Q, in the month of March 2018, the Individual Defendants caused the Company to repurchase 2.5 million shares of its own common stock at an average price per share of approximately $138.79, for a total cost to the Company of approximately $347 million.

175.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $25.29 more than the actual worth of each share during the month of March 2018. Thus, the total over payment by the Company for repurchases of its own stock during March 2018 was approximately $63.2 million.

176.    According to the Company's Form 10-Q for the fiscal quarter ended June 30, 2018, filed with the SEC on August 7, 2018 (the "Q2 2018 10-Q"), in the month of April 2018, the Individual Defendants caused the Company to repurchase 1.5 million shares of its own common stock at an average price per share of approximately $134.62, for a total cost to the Company of approximately $201.9 million.

177.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $21.12 more than the actual worth of each share during the month of April 2018. Thus,

the total over payment by the Company for repurchases of its own stock during April 2018 was over $31.7 million.

178.     According to the Company's Q2 2018 10-Q, in the month of May 2018, the Individual Defendants caused the Company to repurchase 2.6 million shares of its own common stock at an average price per share of approximately $136.78, for a total cost to the Company of over $355.6 million.

179.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $23.28 more than the actual worth of each share during the month of May 2018. Thus, the total over payment by the Company for repurchases of its own stock during May 2018 was over $60.5 million.

180.     According to the Company's Q2 2018 10-Q, in the month of June 2018, the Individual Defendants caused the Company to repurchase 2.1 million shares of its own common stock at an average price per share of approximately $136.58, for a total cost to the Company of over $286.8 million.

181.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $23.08 more than the actual worth of each share during the month of June 2018. Thus, the total over payment by the Company for repurchases of its own stock during June 2018 was approximately $48.5 million.

182.     According to the Company's Q3 2018 10-Q, in the month of July 2018, the Individual Defendants caused the Company to repurchase 2.0 million shares of its own common

stock at an average price per share of approximately $129.97, for a total cost to the Company of over $259.9 million.

183.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $16.47 more than the actual worth of each share during the month of July 2018. Thus, the total over payment by the Company for repurchases of its own stock during July 2018 was over $32.9 million.

184.    According to the Company's Q3 2018 10-Q, in the month of August 2018, the Individual Defendants caused the Company to repurchase 3.4 million shares of its own common stock at an average price per share of approximately $122.85, for a total cost to the Company of approximately $417.7 million.

185.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $9.35 more than the actual worth of each share during the month of August 2018. Thus, the total over payment by the Company for repurchases of its own stock during August 2018 was approximately $31.8 million.

186.    According to the Company's Q3 2018 10-Q, in the month of September 2018, the Individual Defendants caused the Company to repurchase 1.3 million shares of its own common stock at an average price per share of approximately $127.01, for a total cost to the Company of over $165.1 million.

187.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $13.51 more than the actual worth of each share during the month of September 2018.

Thus, the total over payment by the Company for repurchases of its own stock during September 2018 was approximately $17.6 million.

188.     In total, the Company overpaid an aggregate amount of over $451.4 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

## DAMAGES TO MARRIOTT

189.     As a direct and proximate result of the Individual Defendants' conduct, Marriott has lost and expended, and will lose and expend, many millions of dollars.

190.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, CFO, and CAO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

191.     Such expenditures include, but are not limited to, legal fees associated with the Consumer Class Actions filed against the Company, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

192.     Such expenditures include, but are not limited to, legal fees associated with the investigations into the Company launched by the Attorneys General of the states of Maryland, New York and Georgia, and amounts paid to outside lawyers, security experts, and investigators in connection thereto.

193.     Such expenditures include, but are not limited to, the costs of implementing the Response Measures, including WebWatcher enrollment for those affected by the Data Breach.

194.     Such expenditures include, but are not limited to, the costs of replacing passports for individuals affected by fraud as a result of the Data reach.

195.     Such losses include, but are not limited to, approximately $451.4 million that the Company overpaid, at the direction of the Individual Defendants, for its repurchases of its own stock at artificially inflated prices.

196.     Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

197.     As a direct and proximate result of the Individual Defendants' conduct, Marriott has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

198.     Plaintiff brings this action derivatively and for the benefit of Marriott to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Marriott, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

199.     Marriott is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

200.     Plaintiff is, and has been at all relevant times, a shareholder of Marriott. Plaintiff will adequately and fairly represent the interests of Marriott in enforcing and prosecuting its rights,

and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

201.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

202.    A pre-suit demand on the Board of Marriott is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following thirteen individuals: Individual Defendants Sorenson, J.W. Marriott, Duncan, Harrison, Henderson, Hippeau, Kellner, Lee, Lewis, Muñoz, Reinemund, and Schwab (the "Director-Defendants"), and non-party Bush (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to seven of the thirteen directors who were on the Board at the time this action was commenced.

203.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while seven of them engaged in insider sales based on material non-public information, netting proceeds of approximately $45.7 million, while, at the same time, they caused the Company to repurchase its own stock at artificially inflated prices, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

204.    The Board was responsible for risk oversight, including reviewing the Company's cybersecurity risk profile. The Board was informed on the specifics of the cybersecurity risk program in a separate annual presentation by the Company's Chief Information Officer, and is further briefed on actions and changes taken by management to mitigate the Company's risk

profile and provided with an overview of the cybersecurity strategy along with key cybersecurity initiatives and incidents. As a result of such disclosures to the Board, the Director-Defendants were provided with an overview of the cybersecurity risks and threats landscape. According to the 2018 Proxy Statement, the Director-Defendants used such information to review the Company's risk posture. As a result of this knowledge, the Director-Defendants, were, or should have been aware, of the cybersecurity risks posed by its failure to securely store the personal information of its customers. As a result, the Director-Defendants face a substantial likelihood of liability, and therefore, demand is excused.

205.    Further, at the time of the Starwood Acquisition, Starwood had publicly announced that it had experienced a cybersecurity incident. In light of the Board's duties of oversight with respect to the Starwood Acquisition, and the risk oversight duties outlined in the 2018 Proxy Statement, the Director-Defendants, with the exception of Defendants Duncan, Hippeau, and Lewis, breached their duty of oversight by allowing the Starwood Acquisition to go forward without conducting adequate due diligence to discover the ongoing Data Breach, especially in light of the known breach in 2015. As a result, the Director-Defendants, with the exception of Defendants Duncan, Hippeau, and Lewis, face a substantial likelihood of liability due to this failure of oversight, and therefore, demand is excused.

206.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the conduct alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more stable, profitable, and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

207.    Additional reasons that demand on Defendant Sorensen is futile follow. Defendant Sorensen has served as the Company's CEO since 2012 and a Company director since 2011. Thus, as the Company admits, Defendant Sorensen is a non-independent director. Indeed, he receives handsome compensation, including over $13.3 million in the fiscal year ended December 31, 2017. As the Company's CEO, Defendant Sorensen's compensation was inflated by the false and misleading statements described herein, demonstrating his motive in facilitating and participating in the fraud. Moreover, Defendant Sorensen is a Defendant in the Securities Class Action. His insider sales before the fraud was exposed, which yielded approximately $1.6 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company director and CEO during the Relevant Period, Defendant Sorensen conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Indeed, the *Washingtonian* describes Defendant Sorenson as having led the Company's acquisition of Starwood—the value of which was inflated due to the failure to detect the Data Breach—in a January 10, 2018 article about the Marriott family. Defendant Sorensen was ultimately responsible for all of the misconduct alleged herein, including the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings, and the Company's press releases in earnings calls, in which he personally made statements. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Sorensen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

208.    Additional reasons that demand on Defendant J.W. Marriott is futile follow. Defendant J.W. Marriott has served as a director of the Company and its predecessors since 1964. He has served as the Company's Executive Chairman and Chairman since 2012, and previously served as the Company's Chairman and CEO from 1985-2012. Thus, as the Company admits, Defendant J.W. Marriott is a non-independent director. His insider sales before the fraud was exposed, which yielded approximately $9.9 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. He receives handsome compensation, including approximately $3.4 million in the fiscal year ended December 31, 2017. As a long-time Company director and the Company's Chairman and Executive Chairman Defendant J.W. Marriott conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Indeed, *Bloomberg* has reported that Defendant J.W. Marriott is "[k]nown throughout the industry for his hands-on management style." Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K and 2017 10-K. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant J.W. Marriott breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209.    Additional reasons that demand on Defendant Harrison is futile follow. Defendant Harrison has served as a director of the Company since 2014. She has served as the Company's Global Officer, Marriott Culture and Business Councils since 2013, and thus, as the Company admits, is a non-independent director. Her insider sales before the fraud was exposed, which

yielded over $29.3 million in proceeds, demonstrate her motive in facilitating and participating in the fraud. She receives handsome compensation, including $668,513 in the fiscal year ended December 31, 2017. As a trusted Company director and Company executive, Defendant Harrison conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded her duties to monitor engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, she was the maker of many of the false statements and omissions of material fact that are alleged herein, as she signed the 2016 10-K and 2017 10-K. She also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Further, Defendant Harrison is the daughter of Defendant J.W. Marriott, and is beholden to Defendant J.W. Marriott by virtue of their family relationship, and therefore, is unable to evaluate a demand with independence. Indeed, she joined the Company's executive ranks in 2006, after spending 20 years as a stay-at-home mother: a transition all but impossible but for her family affiliations. As reported by the *Washingtonian*, Defendant Harrison assumed her seat on the Board following the ouster of her brother, John W. Marriott III, from the family and business by Defendant J.W. Marriott, as alleged in a lawsuit filed by John W. Marriott III. For these reasons, too, Defendant Harrison breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

210.    Additional reasons that demand on Defendant Duncan is futile follow. Defendant Duncan has served as a director of the Company since 2016, and prior to the Starwood Acquisition, had served as a Director of Starwood since 1999. His insider sales before the fraud was exposed, which yielded over $2.5 million in proceeds, demonstrate his motive in facilitating and

participating in the fraud. He receives handsome compensation, including approximately $225,010 in the fiscal year ended December 31, 2017. As a trusted Company director Defendant Duncan conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K and 2017 10-K. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Duncan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

211.    Additional reasons that demand on Defendant Hippeau is futile follow. Defendant Hippeau has served as a director of the Company since 2016, and prior to the Starwood Acquisition, had served as a Director of Starwood since 1999. His insider sales before the fraud was exposed, which yielded approximately $1.7 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. He receives handsome compensation, including approximately $225,010 in the fiscal year ended December 31, 2017. As a trusted Company director Defendant Hippeau conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K and 2017 10-K. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material

misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Hippeau breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.    Additional reasons that demand on Defendant Muñoz is futile follow. Defendant Muñoz has served as a director of the Company since 2002, and is a member of the Audit Committee. His insider sales before the fraud was exposed, which yielded approximately $612,672 in proceeds, demonstrate his motive in facilitating and participating in the fraud. He receives handsome compensation, including approximately $230,385 in the fiscal year ended December 31, 2017. As a long-time Company director and member of the Audit Committee, Defendant Muñoz conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K and 2017 10-K. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Muñoz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.    Additional reasons that demand on Defendant Lee is futile follow. Defendant Lee has served as a Company director since 2004. She receives handsome compensation, including $239,502 in the fiscal year ended December 31, 2017. Her insider sales before the fraud was exposed, which yielded over $176,487 in proceeds, demonstrate her motive in facilitating and participating in the fraud. As a long-time Company director, Defendant Lee conducted little, if

any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded her duties to monitor engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, she was the maker of many of the false statements and omissions of material fact that are alleged herein, as she signed the 2016 10-K and 2017 10-K. She also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Lee breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

214.    Additional reasons that demand on Defendant Henderson is futile follow. Defendant Henderson has served as a director of the Company since 2013, and is Chair of the Audit Committee. He receives handsome compensation, including approximately $245,010 in the fiscal year ended December 31, 2017. As a trusted Company director and Chair of the Audit Committee, Defendant Henderson conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K and 2017 10-K. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Henderson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

215.    Additional reasons that demand on Defendant Reinemund is futile follow.
Defendant Reinemund has served as a director of the Company since 2007, and is Chair of the
Compensation Policy Committee. He receives handsome compensation, including approximately
$239,496 in the fiscal year ended December 31, 2017. His affiliation with the Company and the
Marriott family is longstanding: after graduating from business school in 1978, he worked at
Marriott's Roy Rodger's division. As a trusted Company director and Chair of the Compensation
Policy Committee Defendant Reinemund conducted little, if any, oversight of the Company's
engagement in the scheme to make false and misleading statements and/or omissions of material
fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously
disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false
statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K and
2017 10-K. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which
contained material misrepresentations and omissions, as alleged above. For these reasons, too,
Defendant Reinemund breached his fiduciary duties, faces a substantial likelihood of liability, is
not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

216.    Additional reasons that demand on Defendant Lewis is futile follow. Defendant
Lewis has served as a director of the Company since 2016, and is a member of the Audit
Committee. Prior to the Starwood Acquisition, had served as a director of Starwood since 2013.
He receives handsome compensation, including approximately $248,923 in the fiscal year ended
December 31, 2017. As a trusted Company director and member of the Audit Committee,
Defendant Lewis conducted little, if any, oversight of the Company's engagement in the scheme
to make false and misleading statements and/or omissions of material fact, consciously disregarded
his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect

corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K and 2017 10-K. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Lewis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

217.    Additional reasons that demand on Defendant Schwab is futile follow. Defendant Schwab has served as a Company director since 2015, and serves as a member of the Compensation Policy Committee. She receives handsome compensation, including $228,253 in the fiscal year ended December 31, 2017. As a trusted Company director and member of the Compensation Policy Committee, Defendant Schwab conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded her duties to monitor engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, she was the maker of many of the false statements and omissions of material fact that are alleged herein, as she signed the 2016 10-K and 2017 10-K. She also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Schwab breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

218.    Additional reasons that demand on Defendant Kellner is futile follow. Defendant Kellner has served as a director of the Company since 2002. He receives handsome compensation, including approximately $235,101 in the fiscal year ended December 31, 2017. As a long-time

Company director, Defendant Kellner conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K and 2017 10-K. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Kellner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219.    Additional reasons that demand on the Board is futile follow.

220.    As described above, seven of the Director-Defendants on the Board directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics. Defendants Duncan, Harrison, Muñoz, Lee, J.W. Marriott, Muñoz, and Sorenson received aggregate proceeds of approximately $45.7 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to Defendants Duncan, Harrison, Muñoz, Lee, J.W. Marriott, Muñoz, and Sorenson, and excused.

221.    Defendants Henderson, Lewis, and Muñoz, (the "Audit Committee Defendants"), and non-party Bush served on the Company's Audit Committee during the Relevant Period. Pursuant to the Audit Committee Charter, and as discussed in the 2018 Proxy Statement, the Audit Committee Defendants were responsible for reviewing and discussing the Company's business and financial risk management and risk assessment policies and procedures with senior management. As a result of the Audit Committee's failures of management and oversight with

respect to cybersecurity risks, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

222.    Defendants Reinemund, Hippeau, and Schwab (the "Compensation Policy Committee Defendants") face a substantial likelihood of liability for their approval of the grant of millions in special supplemental bonuses to the Company's named executive officers, including Defendant Sorenson. As stated in the 2018 Proxy Statement, the special supplemental bonuses were granted for the purported successful integration of Starwood into the Company's operations. In light of the ongoing Data Breach that existed prior to the Starwood Acquisition, at the time the special supplemental bonuses were approved, and thereafter, the Compensation Policy Committee Defendants breached their fiduciary duties by approving and awarding the special supplemental bonuses, and face a substantial likelihood of liability as a result. As a result, the Compensation Policy Committee Defendants cannot evaluate a demand with disinterest, and demand as to them is futile, and thus, excused.

223.    Defendants Sorenson, J.W. Marriott, Harrison, Henderson, Kellner, Lee, Muñoz, Reinemund, and Schwab (the "Legacy Marriott Defendants"), and non-party Bush were all on the Board at the time that the Starwood Acquisition was approved and at the time that it was consummated. The Legacy Marriott Defendants failed to exercise their duty of oversight in reviewing and approving the Starwood Acquisition due to their failure to discover the Data Breach. As a result of this failure of oversight, the Company acquired Starwood, at an artificially inflated price, thus assuming the legal, reputational and financial consequences of the Data Breach. Due to this breach of fiduciary duty, the Legacy Marriott Defendants face a substantial likelihood of liability, are not disinterested in the matters challenged herein, and as a result, demand on the Legacy Marriott Defendants is futile, and therefore, excused.

224.    Defendants Duncan, Hippeau and Lewis (the "Starwood Defendants") all served on the board of Starwood prior to, and during, the Data Breach. As a result of their failures of oversight of Starwood, which continued during their tenures as directors of Marriott, the Starwood Defendants face a substantial likelihood of liability, and are not disinterested in the matters challenged herein. As a result, demand on the Starwood Defendants is futile, and therefore, excused.

225.    Demand in this case is excused because the Director-Defendants, all of whom are named as defendants in this action, and one of whom is a defendant in the Securities Class Action, control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

226.    Defendants J.W. Marriott and Harrison are beneficial owners and controllers of JWM Family Enterprises, L.P. ("Family Enterprises"). Family Enterprises indirectly holds ownership stakes in 17 hotels operated by subsidiaries of the Company, and Family Enterprises paid approximately $12.9 million in fees and expenses to the Company in 2017. Further, Defendants J.W. Marriott and Harrison are members of the Marriott family. Numerous members of the Marriott family are employed by the Company in management and senior executive roles. In 2017, five members of the Marriott family received in excess of $120,000 in compensation from the Company, earning aggregate compensation in excess of $6.7 million (over $3.3 million excluding J.W. Marriott's 2017 compensation). Upon information and belief, other members of

the Marriott family were employed by the Company in 2017 in roles earning $120,000 or less. Thus, as a result of their family relationships with numerous individuals employed by the Company, Defendants J.W. Marriott and Harrison are unable to evaluate a demand with independence, and therefore, demand is excused.

227.    Defendants Sorenson and Reinemund served overlapping tenures on the board of Walmart, Inc. ("Walmart"). Defendant Sorenson served on the board of Walmart from 2008 to 2013. Defendant Reinemund has served on the board of Wal-Mart since 2010. These social and professional connections, combined with the substantial likelihood of liability that Defendant Sorenson faces in the Securities Class Action, and the substantial likelihood of liability that Defendants Sorenson and Reinemund face in the instant action, prevents Defendant Sorenson from evaluating a demand with disinterestedness or independence, and prevents Defendant Reinemund from evaluating a demand with independence. Thus, demand upon Defendants Sorenson and Reinemund is futile, and therefore, excused.

228.    Defendants J.W. Marriott and Muñoz have both served on the board of  directors of the National Geographic society, where Defendant Muñoz continues to serve as a member. As a result of these social and professional connections, neither Defendant J.W. Marriott nor Defendant Muñoz can evaluate a demand with independence and, therefore, demand is excused as to them.

229.    Additionally, each one of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $451.4 million for its own common stock during the period in which the false and misleading statements were made, and the Data Breach was ongoing. The Director-Defendants, as alleged herein, were aware

or should have been aware of the misinformation being spread by the Company, and should have ensured that the Company maintained adequate security practices to prevent the Data Breach, and yet they approved the repurchases. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

230.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Several of the Director-Defendants violated the code by selling shares of Company stock while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Ethics, the Director-Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, protect customer information and the Company's reputation, or conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

231.    Marriott has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Directors or others who were responsible for that wrongful conduct to attempt to recover for Marriott any part of the damages Marriott suffered and will continue to suffer thereby. Thus, any demand on the Director-Defendants would be futile.

232.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

233.    The acts complained of herein constitute violations of fiduciary duties owed by Marriott's officers and directors, and these acts are incapable of ratification.

234.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Marriott. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Directors or certain of the officers of Marriott, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

235.    If there is no directors' and officers' liability insurance, then the Directors will not cause Marriott to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

236.     Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least seven of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

237.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

238.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

239.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

240.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

241.    Under the direction and watch of the Directors, the 2017 Proxy Statement and 2018 Proxy Statement both failed to disclose that: (1) the Company did not maintain customer's personal data on a secure system; (2) unknown actors had gained unauthorized access to Starwood's network since 2014; (3) Marriott's due diligence in the Starwood Acquisition failed to discover the Data Breach; (4) the Data Breach caused personal information of up to 500 million guests to be exposed; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing the Company's public statements were materially false and misleading at all relevant times.

242.    The Individual Defendants also caused the 2017 Proxy Statement and 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's stock price was being artificially inflated by the Individual Defendants' false and misleading statements and repurchases of Company stock, and therefore any compensation based on the Company's stock price was artificially inflated.

243.    The 2017 Proxy Statement and 2018 Proxy Statement also made reference to the Company's Code of Ethics. The Code of Ethics required the Company and Individual Defendants to comply with laws and regulations, maintain the accuracy of Company records and reports, protect customer information and the Company's reputation, conduct business in an honest and ethical manner, and refrain from insider trading. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to

facilitate and disguise the Individual Defendants' violations of law. In further breach of the Code

of Ethics, several of the Individual Defendants sold shares of Company stock while in possession

of material, non-public information about the Company, and the Individual Defendants caused the

Company to fail to protect customer's personal information.

244.    The 2018 Proxy Statement further described management's performance in

integrating Starwood and Marriott as "outstanding" and the integration process as "seamless,"

assertions that were false and misleading in light of the ongoing Data Breach.

245.    In the exercise of reasonable care, the Individual Defendants should have known

that by misrepresenting or failing to disclose the foregoing material facts, the statements contained

in the 2017 Proxy Statement and 2018 Proxy Statement were materially false and misleading. The

misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for

shareholder determination in the 2017 Proxy Statement and 2018 Proxy Statement , including but

not limited to, election of directors, ratification of an independent auditor, and the approval of

officer compensation.

246.    The false and misleading elements of the 2017 Proxy Statement led to the re-

election of Defendants Sorenson, J.W. Marriott, Duncan, Harrison, Henderson, Hippeau, Kellner,

Lee, Lewis, Muñoz, Reinemund, and Schwab allowed them to continue breaching their fiduciary

duties to Marriott.

247.    The false and misleading elements of the 2018 Proxy Statement led to the re-

election of Defendants Sorenson, J.W. Marriott, Duncan, Harrison, Henderson, Hippeau, Kellner,

Lee, Lewis, Muñoz, Reinemund, and Schwab allowed them to continue breaching their fiduciary

duties to Marriott.

248.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement and 2018 Proxy Statement.

249.     Plaintiff, on behalf of Marriott, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

250.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

251.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Marriott. Not only is Marriott now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, the Company itself is also a victim of the unlawful scheme perpetrated upon Marriott by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase billions of dollars of its own shares at artificially-inflated prices, damaging Marriott.

252.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

253.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue

and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Marriott not misleading.

254.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Marriott. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

255.     In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, the Individual Defendants made and/or signed the Company's Form 10-Ks and 10-Qs filed with the SEC during the Relevant Period.

256.     By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

257.     Plaintiff, on behalf of Marriott, has no adequate remedy at law.

## **THIRD CLAIM**

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

258.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

259.     The Individual Defendants, by virtue of their positions with Marriott and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Marriott and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20 (a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Marriott to engage in the illegal conduct and practices complained of herein.

260.     Plaintiff, on behalf of Marriott, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

261.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

262.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Marriott's business and affairs.

263.     Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

264.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Marriott.

265.     In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly caused the Company to permit and/or fail to prevent the Data Breach.

266.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

267.    The Individual Defendants knew or should have known, either through direct knowledge or the existence of red flags, that: (1) threats to customer data security presented a substantial and material risk to the Company; (2) such cyber threats were increasing in frequency and sophistication, both within and outside of the hospitality industry; and (3) such threats, which had materialized at Starwood prior to completion of the Starwood Acquisition, threatened the Company's reputation and profitability, and undermined the value of the Starwood Acquisition. In the face of such knowledge, the Individual Defendants breached their fiduciary duties by failing to implement an effective system of internal controls to protect customers' personal and financial information, and with the exception of Defendants Duncan, Hippeau and Lewis, by failing to factor the Data Breach into their valuation of Starwood.

268.    In further breach of their fiduciary duties owed to Marriott, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company did not maintain customer's personal data on a secure system; (2) unknown actors had gained unauthorized access to Starwood's network since 2014; (3) Marriott's due diligence in the Starwood Acquisition failed to discover the Data Breach; (4) the Data Breach caused personal information of up to 500 million guests to be exposed; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing the Company's public statements were materially false and misleading at all relevant times.

269.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and

omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

270.     In breach of their fiduciary duties, seven of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing over $3.39 billion worth of Company stock at artificially inflated prices.

271.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Marriott's securities and disguising insider sales.

272.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed

knowingly or recklessly and, *inter alia*, for the purpose and effect of artificially inflating the price of Marriott's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

273.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

274.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Marriott has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

275.     Plaintiff, on behalf of Marriott, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

276.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

277.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Marriott.

278.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Marriott that was tied to the performance or artificially inflated valuation of Marriott, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

279.     In particular, Defendant Sorenson, and upon information and belief, Defendants Oberg and Bauduin, were unjustly enriched through the award of special supplemental bonuses awarded as a result of their purported "outstanding performance in 2017 regarding the ongoing

seamless integration of Starwood" due to the fact that the integration of Starwood was far from seamless in light of the Data Breach.

280.     Plaintiff, as a shareholder and a representative of Marriott, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

281.     Plaintiff, on behalf of Marriott, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

282.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

283.     As a result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

284.     In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

285.     The Individual Defendants, and in particular, Defendants Reinemund, Hippeau, and Schwab as members of the Compensation Policy Committee caused the Company to waste millions of dollars by approving special supplemental bonuses for the purportedly successful integration of Starwood, despite the fact that the Starwood Acquisition resulted in the Company's exposure to liability and reputational damage as a result of the Data Breach.

286.     The Individual Defendants, in particular Defendants Sorenson, J.W. Marriott, Harrison, Henderson,  Kellner, Lee, Muñoz, Reinemund, and Schwab caused the Company to waste corporate assets by paying $13.6 billion to acquire Starwood in the Starwood Acquisition, as a result of their failure to discover the Data Breach and adequately discount the purchase price as a result of the Data Breach, which was ongoing at the time of the Starwood Acquisition.

287.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

288.     Plaintiff, on behalf of Marriott, has no adequate remedy at law.

## PRAYER FOR RELIEF

289.     FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Marriott, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Marriott;

(c)     Determining and awarding to Marriott the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Marriott and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Marriott and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of Marriott to nominate at least seven candidates for election to the board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)   Awarding Marriott restitution from Individual Defendants, and each of them;

(f)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)   Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 15, 2019                    Respectfully submitted,


/s/ Timothy Brown                          /s/ Andrew K. O'Connell
(to be admitted *pro hac vice*)            Andrew K. O'Connell (Bar No. 28168)
**THE BROWN LAW FIRM, P.C.**               aoconnell@tandllaw.com
240 Townsend Square                        THOMAS & LIBOWITZ, P.A.
Oyster Bay, NY 11771                       100 Light Street, Suite 1100
Telephone: (516) 922-5427                  Baltimore, Maryland 21202-1053
Facsimile: (516) 344-6204                  Telephone: (410) 752-2468
Email: tbrown@thebrownlawfirm.net          Facsimile: (410) 752-0979

*Attorneys for Plaintiff*                  *Attorneys for Plaintiff*

<u>VERIFICATION</u>

I, Edmund Alves am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _the_ day of March 2019.

3/11/2019

DocuSigned by:

C83EFCEF3B9E48B...

Edmund Alves